UNITED STATES of America, Appellee,

v.

Frederick CARDOZA, Defendant, Appellant.

No. 96–1470.

United States Court of Appeals, First Circuit.

Heard May 8, 1997.

Decided Oct. 27, 1997.

Jeffrey M. Smith, Boston, MA, with whom John M. Moscardelli and Peters, Smith & Moscardelli were on brief, for appellant.

Ralph F. Boyd, Jr., Assistant United States Attorney, Boston, MA, with whom Donald K. Stern, United States Attorney, and Dina Michael Chaitowitz, Assistant United States Attorney, were on brief, for appellee.

Before SELYA, Circuit Judge, and COFFIN and BOWNES, Senior Circuit Judges.

BOWNES, Senior Circuit Judge.

Defendant–Appellant Frederick Cardoza appeals his convictions and sentence under the felon-in-possession statute, 18 U.S.C. § 922(g)(1) and the Youth Handgun Safety Act, 18 U.S.C § 922(x). His appeal is primarily based on multiple constitutional arguments, which shall be addressed in turn. We affirm.

## Facts

We review the facts in the light most favorable to the verdict. *United States v. Wihbey,* 75 F.3d 761, 764 (1st Cir.1996). In July of 1995, a sixteen-year-old acquaintance of Cardoza, Myron Ragsdale, asked Cardoza to secure a handgun for him to purchase. Cardoza found a dealer willing to sell a nine-millimeter semiautomatic handgun to Ragsdale for $200.00. On the night of July 14, 1995, Cardoza and Ragsdale went to Walnut Park in Roxbury, Massachusetts, to make the gun purchase. Ragsdale paid $200.00 for the handgun and nine rounds of ammunition. Ragsdale loaded the gun with eight rounds of ammunition, and Cardoza took possession of the ninth round.

Sometime after the transaction was completed, Cardoza and Ragsdale began walking along Humboldt Avenue. As they walked, Ragsdale had the handgun in his waistband and Cardoza carried the single round of ammunition in his hand. By this time it was approximately 2:00 a.m. on the morning of July 15. They were spotted walking along Humboldt Avenue by four officers of the Boston Police's Youth Violence Strike Force who were patrolling the area in an unmarked police car. One of the officers in the car, Gregory Brown, noticed that Cardoza and

Ragsdale were acting indecisively about whether to continue walking up Humboldt, or instead cross the street in front of the police car. Moving slowly, the police car approached Cardoza and Ragsdale from behind. As the patrol car approached, Cardoza and Ragsdale crossed Humboldt Avenue in order to walk up the sidewalk of Ruthven Street, a one-way thoroughfare that emptied onto Humboldt Avenue. As they crossed in front of the car, Officer Brown, who was sitting in the back seat on the driver's side, recognized Cardoza and directed the driver to make a left turn off Humboldt, and proceed the wrong way up Ruthven for a short distance. Officer Brown testified that he wanted to ask Cardoza some questions concerning a shooting incident that had occurred some days earlier. The driver took the left turn, and pulled over to the curb just off Humboldt, facing the wrong way on Ruthven Street.

Officer Brown, whose window was rolled down, called out to Cardoza, asking "What's up Freddie? What are you doing out this time of night?" Cardoza stopped, turned, and approached the patrol car. Ragsdale continued walking a short distance. Officer Brown remained in the car conversing with Cardoza through the open car window. As he talked with Officer Brown, Cardoza began to gesture with his hand, exposing the round of ammunition. Seeing the round of ammunition, Brown exited the patrol car, and began to pat-frisk Cardoza. At the same time, two other officers exited the car and approached and pat-frisked Ragsdale, discovering the handgun loaded with eight rounds of ammunition.

Cardoza was indicted on four counts. Count I charged Cardoza with being a felon-in-possession of one round of ammunition, in violation of 18 U.S.C. § 922(g)(1). Count II charged Cardoza under the same statutory provision with being a felon-in-possession of the semi-automatic firearm, based on his alleged possession of the weapon for a short period of time after the transaction. Count III charged Cardoza with causing the sale, delivery, and transfer of a handgun to a juvenile in violation of the Youth Handgun Safety Act, codified at 18 U.S.C. § 922(x). Count IV charged Cardoza with aiding and abetting a juvenile in the possession of a handgun in violation of the same. A jury returned a guilty verdict on Counts I, III, and IV, and acquitted on Count II. Following the jury verdict, but prior to sentencing, the district court issued a memorandum detailing its refusal to grant both Cardoza's motion to dismiss and his motion for judgment of acquittal. *United States v. Cardoza*, 914 F.Supp. 683 (D.Mass.1996). The district court sentenced Cardoza under the Guidelines to 235 months of imprisonment and five years of supervised release. This appeal followed.

## I.

### The Meaning of "Ammunition"

■ Cardoza launches his appeal by arguing that the single nine millimeter bullet which he was convicted of possessing is not "ammunition" within the meaning of 18 U.S.C. § 922(g). We disagree.

Cardoza was convicted of violating the felon-in-possession statute, which makes it illegal for a convicted felon "to possess in or affecting commerce, any firearm or ammunition...." 18 U.S.C § 922(g)(1)(West Supp. 1997). "Ammunition" is defined as "ammunition or cartridge cases, primers, bullets, or propellent powder designed for use in any firearm." 18 U.S.C. § 921(a)(17)(A)(West Supp.1997). Cardoza suggests first that the statutory definition, by including the plural words "cases, primers, [and] bullets" bans only the possession of more than one piece of ammunition. Second, he suggests that the word "ammunition" itself always means multiple rounds. Finally, Cardoza argues that the definition of "ammunition" is sufficiently ambiguous to require application of the "rule of lenity," *United States v. Lanier*, —— U.S. ——, ——, 117 S.Ct. 1219, 1225, 137 L.Ed.2d 432 (1997), in his favor. The court below determined that "[n]o amount of wordplay will contradict the plain meaning of the statute, an honest reading of which leads to the inexorable conclusion that a single nine millimeter bullet ... constitutes ammunition for the purposes of [§ 922(g)(1) ]." *Cardoza*, 914 F.Supp. at 686–87.

■ This question is one of statutory construction which we review de novo. *Strickland v. Commissioner, Maine Dep't of Human Servs.*, 96 F.3d 542, 545 (1st Cir.1996). In this instance, we need not venture far beyond the words of the statute.

We think the common sense, everyday understanding of the word "ammunition" encompasses a single bullet or cartridge. *See O'Connell v. Shalala*, 79 F.3d 170, 176 (1st Cir.1996) ("courts are bound to afford statutes a practical, commonsense reading"). Thus courts, and the public generally, refer to ammunition in terms of "rounds." *See United States v. Brimage*, 115 F.3d 73, 76 (1st Cir.1997), *cert. denied,* — U.S. —, 118 S.Ct. 321, 139 L.Ed.2d 248 (1997)("loaded with six rounds of ammunition"); *United States v. Balanga*, 109 F.3d 1299, 1300 (8th Cir.1997)("a single round of .22 caliber ammunition"). If the word "ammunition" was incapable of meaning one bullet, one would not refer to a "single round of ammunition." [1]

To hold otherwise would result in an absurdity. *Marques v. Fitzgerald*, 99 F.3d 1, 5 (1st Cir.1996)("[A] statute may not be construed in a manner that results in absurdities or defeats its underlying purpose."). Congress enacted the Omnibus Crime Control and Safe Streets Act of 1968 (of which § 922(g)'s predecessor was a part), inter alia, to keep certain weaponry "out of the hands of those not legally entitled to possess them ·because of ... criminal background...." S.Rep. No. 90–1097, at 28 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2113. It would therefore make little sense to interpret § 922(g) to criminalize possession of two bullets, but not one, when Congress' purpose was to deprive certain persons of any firepower.

## II.

### The Interstate Commerce Nexus

■ Cardoza next assigns error to the district court's failure to dismiss the indictment, arguing that the Supreme Court's decision in *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), compels a finding that both 18 U.S.C. § 922(g) and § 922(x) as applied to him exceed congressional power under the Commerce Clause. Our review of constitutional challenges to federal statutes is de novo. *United States v. Bongiorno*, 106 F.3d 1027, 1030 (1st Cir. 1997).

In *Lopez* the Court struck down the Gun-Free School Zones Act of 1990 ("GFSZA"), which criminalized the possession of a handgun within a school zone, as being beyond the reach of Congress' affirmative powers under the Commerce Clause. 514 U.S. at 567–68, 115 S.Ct. at 1633–34. Identifying the GFSZA as an attempted regulation of purely intrastate activity (possession alone) that has an effect on interstate commerce, the Court clarified existing precedent to hold that where Congress attempts to control such activity, the "proper test [of the statute's constitutionality] requires an analysis of whether the regulated activity 'substantially affects' interstate commerce." *Id.* at 559, 115 S.Ct. at 1630. Because the "possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce," *id.* at 567, 115 S.Ct. at 1634, enactment of the GFSZA exceeded congressional power under the Commerce Clause.

Cardoza urges us to extend the Court's *Lopez* reasoning to the statutes under which he was convicted. We address each statute in turn.

### A.

### 18 U.S.C. § 922(g)(1)

■ As an initial matter, it is now well-settled in this circuit that "a facial challenge to the constitutionality of the statute at issue, [§ 922(g) ], is 'hopeless on ... the law.'" *United States v. Blais*, 98 F.3d 647, 649 (1st Cir.1996), *cert. denied,* — U.S. —, 117 S.Ct. 1000, 136 L.Ed.2d 879 (1997)(quoting

---

1. We note that even the Supreme Court has assumed, albeit in dicta, that the term "ammunition" means a single bullet. *See United States v. Batchelder*, 442 U.S. 114, 121 n. 7, 99 S.Ct. 2198, 2202 n. 7, 60 L.Ed.2d 755 (1979)("[B]ecause § 922(h) alone proscribes receipt of ammunition, a felon who obtained a single bullet could receive a 5-year sentence....").

*United States v. Bennett,* 75 F.3d 40, 49 (1st Cir.), *cert. denied,* — U.S. —, 117 S.Ct. 130, 136 L.Ed.2d 79 (1996)). Cardoza instead argues that § 922(g) exceeds congressional commerce clause authority because it fails to require proof that possession of a single ammunition cartridge "substantially affects" interstate commerce as purportedly mandated by *Lopez.* Cardoza would therefore have us hold that *Lopez* impliedly changes the meaning of the jurisdictional element present in § 922(g) such that the ammunition which he possessed must have "substantially affected" interstate commerce before his conviction passes Commerce Clause scrutiny. This application of the *Lopez* decision to § 922(g) has been rejected by this court more than once. *United States v. Smith,* 101 F.3d 202, 215 (1st Cir.1996), *cert. denied,* — U.S. —, 117 S.Ct. 1345, 137 L.Ed.2d 503 (1997); *Blais,* 98 F.3d at 649; *see also United States v. Diaz–Martinez,* 71 F.3d 946, 953 (1st Cir. 1995) (rejecting identical argument in appeal from § 922(k) conviction).

To be perfectly clear, when the Court stated that "the proper test requires an analysis of whether the regulated activity 'substantially affects' interstate commerce," *Lopez,* 514 U.S. at 559, 115 S.Ct. at 1630, it was not revising the government's burden of proof on a jurisdictional element in criminal proceedings, but instead identifying the extent to which purely intrastate activities must impact interstate commerce before Congress may legislate under the Commerce Clause. *See United States v. Robertson,* 514 U.S. 669, 671, 115 S.Ct. 1732, 1733, 131 L.Ed.2d 714 (1995)(per curiam)("The 'affecting commerce' test was developed in our jurisprudence to define the extent of Congress's power over purely *intra*state commercial activities that nonetheless have substantial *inter*state effects."). Therefore, because the Court had no occasion in *Lopez* to reach the question, 514 U.S. at 561–62, 115 S.Ct. at 1630–31, it remains the law that where a federal criminal statute contains a jurisdictional element requiring proof that an object was "in or affecting" commerce, the government need only meet the "minimal nexus" test enunciated in *Scarborough v. United States,* 431 U.S. 563,

577, 97 S.Ct. 1963, 1970, 52 L.Ed.2d 582 (1977). *Blais,* 98 F.3d at 649 ("*Scarborough* is still good law after *Lopez.*"). Because the government proved below that the ammunition cartridge had moved in interstate commerce, the district court correctly denied Cardoza's motion to dismiss Count I.

## B.

### 18 U.S.C. § 922(x)

■ Raising a question of first impression in this circuit, Cardoza next urges us to extend the *Lopez* reasoning to his conviction under the Youth Handgun Safety Act ("YHSA"), codified at 18 U.S.C. § 922(x). Because we find that the YHSA regulates the national juvenile market in handguns by prohibiting certain intrastate activities, it is a proper exercise of Congress' authority. *See United States v. Michael R.,* 90 F.3d 340, 343–45 (9th Cir.1996)(upholding YHSA against *Lopez*-based Commerce Clause challenge).

The Commerce Clause gives Congress the power to "regulate Commerce ... among the several States." U.S. Const., art. I, § 8, cl. 3. The Supreme Court has recognized three categories of activities which Congress may reach under this provision. *Lopez,* 514 U.S. at 558–59, 115 S.Ct. at 1629–30.

> First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, those activities that substantially affect interstate commerce.

*Id.* Our review of a statute's constitutionality under the Commerce Clause is decidedly limited. First, we must "defer to a congressional finding that a regulated activity [substantially] [2] affects interstate commerce, if there

---

2. As explained *supra,* the *Lopez* majority modified the *Hodel* standard to require a finding that

the activity "substantially affects" interstate com-

is any rational basis for such a finding." *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 276, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1 (1981). Second, "the only remaining question for judicial inquiry is whether 'the means chosen by [Congress][are] reasonably adapted to the end permitted by the Constitution.'" *Id.* (first alteration in original)(quoting *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 262, 85 S.Ct. 348, 360, 13 L.Ed.2d 258 (1964)).

By invoking *Lopez* as the sole controlling authority, Cardoza is arguing that the YHSA can only be upheld as an example of the third permitted category.[3] Although we think the YHSA "is likely supportable under more than one of these rubrics," *Bongiorno*, 106 F.3d at 1031, we meet Cardoza's contention, and find that the intrastate sale, transfer, delivery, and possession of handguns to and by juveniles sufficiently impact interstate commerce to pass constitutional muster.

To begin with, we note that the Commerce power has long been exercised to regulate the national market in firearms. *See Huddleston v. United States*, 415 U.S. 814, 824–29, 94 S.Ct. 1262, 1268–71, 39 L.Ed.2d 782 (1974)(assuming congressional power to enact federal gun control legislation); *United States v. Rybar*, 103 F.3d 273, 279–82 (3d Cir.1996)(compiling history of federal gun control legislation in rejecting *Lopez*-based challenge to § 922(*o*)), *cert. denied,* —— U.S. ——, 118 S.Ct. 46, —— L.Ed.2d —— (1997). Thus in *Rybar*, the Third Circuit upheld the constitutionality of a federal criminal statute making it illegal to "transfer or possess a machinegun," 18 U.S.C. § 922(*o*)(1) (West Supp.1997), stating that

> [t]here was no reason for Congress to believe that traffic in machine guns had any less connection with interstate commerce than did the possession of a firearm by a felon, and Congress' intent to regulate possession and transfer of machine guns as a

means of stemming interstate gun trafficking is manifest.

*Id.* at 282.

Under the third permitted category, "[w]here economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained." *Lopez,* 514 U.S. at 560, 115 S.Ct. at 1630. As an initial matter we find that the YHSA is a regulation of economic activity. This is so because it prohibits expressly commercial activity, namely, the sale, transfer, or delivery of handguns to juveniles. It therefore stands in direct opposition to the statute invalidated in *Lopez*, which "by its terms ha[d] nothing to do with 'commerce' or any sort of economic enterprise...." *Id.* at 561, 115 S.Ct. at 1630–31.

Similarly, we think the possessory prong of the YHSA, under which Cardoza was convicted of aiding and abetting, is "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Id.* This is so because the YHSA was designed expressly to "stop[ ] the commerce in handguns with juveniles nationwide...." H.R. Conf. Rep. No. 103–711, at 391 (1994), *reprinted in* 1994 U.S.C.C.A.N. 1858, 1859. Part of this regulatory approach involves the suppression of the demand for such handguns. The YHSA can be thus seen as criminalization of the two points where the prohibited commerce finds its nexus; the demand for the firearms (possession), and the sale or transfer designed to meet that demand. The two prohibitions go hand in hand with one another. Invalidation of one half of the equation would likely have deleterious effects on the efficacy of the legislation. In this regard, we think it clear that given Congress' express purpose, its decision to punish both the supply (sale or transfer) and demand (possession) sides of the market is a means reasonably calculated to achieve its end. *Hodel,* 452 U.S. at 276, 101 S.Ct. at 2360.

merce. *Lopez,* 514 U.S. at 559, 115 S.Ct. at 1630.

**3.** This is so because *Lopez* expressly avoided analysis of the first two categories. 514 U.S. at 559, 115 S.Ct. at 1630.

So far, we have determined that the YHSA regulates economic activity, and that the possessory prong of the YHSA is integral to the regulation. Assuming, then, for purposes of this appeal, that the regulated activity occurs solely intrastate, we must now pass on whether this activity "substantially affects" interstate commerce. We turn first to the legislative findings on the matter. *Lopez*, 514 U.S. at 562, 115 S.Ct. at 1631 ("we of course consider legislative findings ... regarding effect on interstate commerce...."). Concerned that "[c]rime, particularly crime involving drugs and guns, is a pervasive, nationwide problem; problems with crime at the local level are exacerbated by the interstate movement of drugs, guns and criminal gangs; firearms and ammunition, and handguns in particular, move easily in interstate commerce," H.R. Conf. Rep. No. 103–711, at 390 (1994), *reprinted in* 1994 U.S.C.C.A.N. 1858, Congress found that "it is necessary and appropriate to assist the States in controlling crime by stopping the commerce in handguns with juveniles nationwide...." *Id.* at 391, 1994 U.S.C.C.A.N. at 1859. This indicates that Congress determined that the market for handguns among juveniles was national. We do not think this observation can be seriously disputed. As the court in *Rybar* concluded, "[c]ongressional findings generated throughout Congress' history of firearms regulation link both the flow of firearms across state lines and their consequential indiscriminate availability with the resulting violent criminal acts that are beyond the effective control of the state." 103 F.3d at 279.

The answer, therefore, to whether an intrastate market in handguns for juveniles "substantially affects" the interstate market in such commodities is obvious. Simply put, the handgun must come from somewhere, often out of state. Indeed, it is worth noting here that even though the YHSA does not require it, the government introduced evidence at trial that the handgun transferred to Ragsdale had, in fact, been manufactured outside Massachusetts. Therefore, the supply and demand for handguns in any given state will "substantially affect" interstate commerce in handguns by causing the weapons to move across state lines.

In *Lopez*, the Court examined its decision in *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), stating that the decision was "perhaps the most far reaching example of Commerce Clause authority over intrastate activity...." *Lopez*, 514 U.S. at 560, 115 S.Ct. at 1630. Still, Chief Justice Rehnquist quoted with approval the *Wickard* analysis that "a factor of such volume and variability as home-consumed wheat would have a substantial influence on price and market conditions." *Id.* at 560, 115 S.Ct. at 1630 (quoting *Wickard*, 317 U.S. at 128, 63 S.Ct. at 90–91). We think the intrastate commerce in handguns goes well beyond the "substantial influence" present in *Wickard*. As such, the YHSA is proper under the Commerce Clause.

## III.

### The Fourth Amendment Claim

■ Cardoza next challenges the district court's denial of his motion to suppress the bullet, arguing that the evidence was the result of an unconstitutional search and seizure. Cardoza suggests that because the police admitted that they did not have reasonable and articulable suspicion to "Terry-stop" Cardoza, discovery of the bullet flowed from an unreasonable seizure, and thus must be excluded. *See generally United States v. Zapata*, 18 F.3d 971, 975–77 (1st Cir.1994). Because we agree that there was no "seizure" within the meaning of the Fourth Amendment at the time the police officer saw the bullet in Cardoza's hand, we uphold the lower court's denial of Cardoza's suppression motion.

■ Our review of a lower court's denial of a suppression motion is bifurcated. We review the district court's findings of fact for clear error, *United States v. Young*, 105 F.3d 1, 5 (1st Cir.1997), which "exists only if, after considering all of the evidence, we are left with a definite and firm conviction that a mistake has been made," *id.* (quoting *United States v. McCarthy*, 77 F.3d 522, 529 (1st Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 479, 136 L.Ed.2d 374 (1996)). As we stated in *Young*, this deference to the lower court's

fact finding "reflects our awareness that the trial judge ... sits in the best position to determine what actually happened." *Id.* Conversely, we review conclusions of law de novo, subjecting constitutional interpretations to plenary review. *Id.; Ornelas v. United States,* — U.S. —, —, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996). Finally, as a general matter, we uphold a district court's denial of a suppression motion "provided that any reasonable view of the evidence supports the decision." *McCarthy,* 77 F.3d at 529.

We begin with the factual findings of the district court, which do not differ in substance from our recitation of the facts *supra.* The record demonstrates that portions of the police officer's as well as Cardoza's and Ragsdale's testimony were credited in making the findings. The court's findings of fact are supported by the evidence, *United States v. Sealey,* 30 F.3d 7, 8 (1st Cir.1994), and we detect no error.

Turning to the court's rulings of law, Cardoza argues that because the court stated at the hearing that in the absence of a response from Cardoza, "the police officers would have run them down," the court was in essence finding that Cardoza was seized by the time the bullet was seen. Although the lower court's legal conclusions on the Fourth Amendment issue lack the precision and clarity desirable for appellate review, we think Cardoza's argument ignores the entirety of the court's reasoning in favor of an irrelevant aside. Reading the findings in total, it is apparent that the court determined that there was no "stop" within the meaning of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Our reasoning is as follows. The court found that prior to seeing the bullet in his hand, the police had no basis upon which to constitutionally detain Mr. Cardoza. Yet it went on to hold that the interaction between Officer Brown and Cardoza was "lawful," and provided no grounds

upon which to exclude the evidence. Under current Fourth Amendment jurisprudence, the only way the district court could have determined that the interaction was lawful (here meaning constitutional) and also hold that there was no reasonable and articulable suspicion upon which to detain Cardoza, was for it to decide that the police were not detaining, or seizing, Cardoza within the meaning of the Fourth Amendment.[4] We conclude therefore that the court below determined that there was no seizure of Cardoza prior to Officer Brown's sighting of the bullet in Cardoza's hand. *See McCarthy,* 77 F.3d at 525 ("Where specific findings are lacking, we view the record in the light most favorable to the ruling, making all reasonably supported inferences.").

We now turn to the gravamen of Cardoza's Fourth Amendment argument, namely, whether the district court's determination that there was no seizure was correct. To be sure, "not all personal intercourse between policemen and citizens involves 'seizures' of persons." *Terry,* 392 U.S. at 19 n. 16, 88 S.Ct. at 1879 n. 16. Instead, "[i]nteraction between law enforcement officials and citizens generally falls within three tiers of Fourth Amendment analysis, depending on the level of police intrusion into a person's privacy." *Young,* 105 F.3d at 5. The first tier "encompasses interaction of such minimally intrusive nature that it does not trigger the protections of the Fourth Amendment." *Id.* It has therefore been recognized that police officers may approach citizens in public and ask questions without the need for articulable suspicion of criminal activity. *Florida v. Bostick,* 501 U.S. 429, 434–35, 111 S.Ct. 2382, 2386–87, 115 L.Ed.2d 389 (1991); *Young,* 105 F.3d at 6.

Undoubtedly, Fourth Amendment analysis does not easily lend itself to bright line distinctions. *See Zapata,* 18 F.3d at 975. It is therefore the case that,

---

4. The government also suggests that because the district court inferred that Cardoza deliberately approached the cruiser in order to throw the police off Ragsdale, there was no "submission to" a police show of authority within the meaning of *California v. Hodari D.,* 499 U.S. 621, 626, 111 S.Ct. 1547, 1550–51, 113 L.Ed.2d 690 (1991), because of the fact that Cardoza's actions were motivated not by acquiescence to a police request, but rather his own strategic decision. We note only that, given the generally objective standards employed in Fourth Amendment seizure analysis, we would see little reason to inquire into the subjective intent of the detainee in making the determination whether or not he or she has "submitted to" a show of authority.

in order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.

*Bostick,* 501 U.S. at 439, 111 S.Ct. at 2389. The test employed in this area is highly fact specific. As a result, the Court in *Bostick* rejected a per se rule that police drug interdiction efforts on bus lines were always unconstitutional because it determined that any analysis that hinged on a single dispositive factor foreclosed consideration of "all the circumstances...." *Id. See also Michigan v. Chesternut,* 486 U.S. 567, 572, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988) ("[A]ny assessment as to whether police conduct amounts to a seizure implicating the Fourth Amendment must take into account all of the circumstances surrounding the incident in each individual case.")(internal quotation omitted).

Our decisions have adhered to an analysis that considers the totality of the circumstances particular to each encounter. *Young,* 105 F.3d at 6. In doing so we have had the recent opportunity to examine the existence of Fourth Amendment seizures under facts remarkably similar to the case at hand. Thus, in *Young* we found no seizure where a police cruiser "pulled alongside [defendant], the officers identified themselves as Boston Police officers, and asked 'got a minute' to which [defendant] replied 'sure.'" *Id.* Similarly, in *Sealey,* there was no Fourth Amendment violation where police officers in a cruiser approached the defendant and yelled "Hey Stephen, what's up?" before the defendant took flight. 30 F.3d at 8, 10. In each instance, our determination was informed by the observation that "in the absence of an officer's exertion of physical force or an individual's submission to a show of authority, no seizure occurs." *Young,* 105 F.3d at 6; *Sealey,* 30 F.3d at 10.

Cardoza focuses our attention on several facts particular to his situation that ostensibly compel a holding contrary to *Young* and *Sealey.* First, the question posed to him, "Why are you out at this time of night?" is more demanding and pointed an inquiry than the generalized queries at issue in *Young* and *Sealey.* Second, the police cruiser turned the wrong way up a one-way street, albeit for a very short distance, making clear the officer's intention to come into contact with Cardoza. Finally, Cardoza adds that his past interactions with the same officer led him to believe that he was not free to leave at the time he was called over. Although each of these facts distinguishes his case from *Young* and *Sealey,* our job in identifying whether a Fourth Amendment seizure has occurred is not absolutely controlled by the traditional operation of factually similar precedent. This is so because no two police-citizen encounters will ever be completely identical. We therefore reject the government's assertion that *Young* dispositively controls the outcome of this appeal. Instead, "we adhere to our traditional contextual approach, and determine only that, in this particular case, the police conduct in question did not amount to a seizure." *Chesternut,* 486 U.S. at 573, 108 S.Ct. at 1979. We make this determination in the instant case because the police conduct at issue was not a "show of authority" within the meaning of Fourth Amendment jurisprudence. *Hodari D.,* 499 U.S. at 625–29, 111 S.Ct. at 1550–52.

As the Court observed in *Hodari D.,* "the test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *Id.* at 628, 111 S.Ct. at 1551. Similarly, it was noted in *Chesternut* that

> [t]he test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation. Moreover, what constitutes a restraint on liberty prompting a person to conclude that he is not free to "leave" will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs.

486 U.S. at 573, 108 S.Ct. at 1979.

Our inquiry is not directed at whether the police conduct objectively communicated po-

lice. desire to *speak* to Cardoza, or ask him a *question.*[5] Rather, we must determine whether their conduct indicated that they were interfering with his *liberty* to such an extent that he was not free to leave. We think the distinction important, and are left, therefore, with the conclusion that the police officers' conduct on the night in question would not have communicated to a reasonable person that the police were attempting to "intrude upon [Cardoza's] freedom of movement." *Id.* at 575, 108 S.Ct. at 1980.

To begin with, no sirens or flashing lights were used by the officers to indicate to Cardoza that he should stop in his tracks. Similarly, the police cruiser pulled over and stopped at the curb before Officer Brown called out to Cardoza. *Compare Chesternut*, 486 U.S. at 576, 108 S.Ct. at 1980–81 (short drive alongside defendant not "so intimidating" as to constitute seizure). And Officer Brown remained in the car when he called out to Cardoza. In total, the encounter does not objectively communicate a "restrain[t against] his freedom to walk away...." *Terry*, 392 U.S. at 16, 88 S.Ct. at 1877. Officer Brown did not ask Cardoza to stop, or even to approach the car. He simply called out through an open car window with the question "what are you doing out at this time of night?" Those words do not objectively communicate an attempt to restrain Cardoza's liberty. We are therefore unpersuaded that the police officers' actions transformed "mere police questioning," *Bostick*, 501 U.S. at 434, 111 S.Ct. at 2386, into a seizure.

We recognize, of course, the import of Cardoza's observation that few people, including himself, would ever feel free to walk away from any police question. Under this reasoning, however, the standard reiterated in *Bostick* transforms every police-citizen encounter into a seizure. *See United States v. Tavolacci*, 895 F.2d 1423, 1425

(D.C.Cir.1990)(recognizing criticism of test as "based on a false assumption that ordinary citizens believe they are normally free to cut police inquiries short."). The "free to walk away" test, however, must be read in conjunction with the Court's frequent admonitions that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Bostick*, 501 U.S. at 434, 111 S.Ct. at 2386; *Terry*, 392 U.S. at 19 n. 16, 88 S.Ct. at 1879 n. 16. What emerges between the two imperatives, therefore, is the directive that police conduct, viewed from the totality of the circumstances, must objectively communicate that the officer is exercising his or her official authority to restrain the individual's liberty of movement before we can find that a seizure occurred.[6] Because there was no such objective communication in the instant case, we affirm the district court's denial of Cardoza's motion to suppress.

### IV.

### The Sentence

Cardoza's final argument posits that his 235–month sentence under the Armed Career Criminal Act ("ACCA") and the United States Sentencing Guidelines ("U.S.S.G.") offends both the Eighth Amendment's proscriptions against cruel and unusual punishments and the Fifth Amendment's guarantees of due process.

Cardoza was sentenced under the Armed Career Criminal enhancement, 18 U.S.C. § 924(e), and the corresponding Guideline section, U.S.S.G § 4B1.4, because he violated the felon-in-possession statute, 18 U.S.C. § 922(g), and had at least three prior convictions for violent felonies which had been committed on occasions different from one another. Cardoza's Pre–Sentence Report ("PSR") contains a record of four violent felonies of

---

5. Indeed, it would appear that this is exactly what the district court was referring to when it stated at the suppression hearing that the police "intended to exercise their authority at least to bring themselves into a position to confront Mr. Cardoza."

6. As for Cardoza's contention that the court's observation that the police officers would have

"run them down" compels a contrary holding, he is mistaken. In determining whether a seizure occurred, "the subjective intent of the officers is relevant to an assessment of the Fourth Amendment implications of police conduct only to the extent that that intent has been conveyed to the person confronted." *Chesternut*, 486 U.S. at 575 n. 7, 108 S.Ct. at 1980 n. 7.

which he had been convicted, which are described below, the facts being drawn from the unobjected-to portions of the PSR. *United States v. Voccola*, 99 F.3d 37, 43 (1st Cir.1996).[7]

On June 27, 1988, Cardoza was arrested and arraigned for attempting to steal an automobile, assault and battery of a police officer, receipt of stolen property, and possession of burglarious tools. On February 13, 1989, he was arrested and arraigned for stealing a woman's wallet at a local mall, possession of burglarious tools, and receipt of a stolen car which he had attempted to use in his getaway. On March 15, 1989, Cardoza and another individual were arrested for armed robbery, and assault and battery with a dangerous weapon, having held up an individual by restraining the victim from behind and holding a screwdriver against the victim's throat. He was convicted of this latter offense and sentenced on July 28, 1989, in Suffolk County Superior Court to twenty years for the armed robbery count, two years to serve, and ten years on the assault and battery with a dangerous weapon count, one year to serve. He was convicted and sentenced on August 18, 1989, for the former two offenses in Roxbury District Court to two and one-half years incarceration for each, sentences to run concurrent with the sentence imposed in Suffolk Superior Court for the armed robbery charge. Cardoza was released from prison on June 10, 1991.

Less than four months after his release, on October 2, 1991, he was arrested with four other men after the car in which they were riding pulled up beside another vehicle, a passenger in the car containing Cardoza pointed a semi-automatic weapon out the window, and proceeded to fire four rounds into the adjacent automobile. He was convicted and sentenced in Suffolk County Superior Court for assault with a dangerous weapon, knowingly receiving stolen property, and possession of a firearm. He received three to five years incarceration. Cardoza was released on September 30, 1994. The offenses for which he was convicted in the instant appeal occurred just over nine months later.

At sentencing, the government and Cardoza's counsel agreed that the proper sentence calculation under the ACCA and U.S.S.G. was 235 to 293 months. No argument was made by Cardoza's counsel to depart downward.[8] Cardoza did, however, press his constitutional arguments both in his objections to the PSR and at the disposition hearing. Cardoza was sentenced to 235 months incarceration on Count I, one year each on Counts III and IV to run concurrent with Count I and each other, and supervised release of five years. The court concluded sentencing with the following statement:

> I've given you the most lenient sentence that I am authorized to give under the law. And yet that lenient sentence, at least given what discretion I have, sentences you to prison for nearly 20 years of your life. And the fact is that, ... as you were building up this conviction after conviction after conviction after conviction in the state courts, with these short sentences or no sentences, you were laying the groundwork for this sentence which is imposed upon you exactly as [your attorney] explained it, because you are a felon in possession of ammunition, one bullet; and because, given your prior history, you are considered by the Court and by society to be an armed career criminal.
>
> Now, these are the laws that I must follow. Society has decided through the Congress that it simply will not tolerate

---

7. We briefly elaborate on the facts underlying Cardoza's four violent felonies not because the facts of each conviction are relevant to the sentencing process itself. They are not. *See United States v. Damon*, 127 F.3d 139, 145 (1st Cir.1997)("Congress intended that the Guidelines take a categorical approach to sentencing."). Instead, we provide a short explication in order to refute Cardoza's contention that he is being sentenced solely for possession of a bullet.

8. Cardoza notes in his brief his contention that several of his convictions below were unconstitutionally obtained. His counsel conceded at the disposition hearing, however, that he cannot collaterally attack these convictions at sentencing. *Custis v. United States*, 511 U.S. 485, 497, 114 S.Ct. 1732, 1739, 128 L.Ed.2d 517. (1994). The district court was correct that Cardoza may return to it should a subsequent constitutional attack prove successful. *United States v. Pettiford*, 101 F.3d 199 (1st Cir.1996).

this violence, will not tolerate people who have such a record from committing other crimes. I am required to impose this sentence given the legal framework under which we operate. It is a just sentence.

## A.

### The Eighth Amendment

■■■ Cardoza supports his Eighth Amendment challenge on the basis of the Supreme Court's decision in *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), arguing that his sentence, like the life sentence imposed in *Helm* under a recidivist statute for writing a $100 "no-account" check, is "significantly disproportionate to his crime, and is therefore prohibited by the Eighth Amendment," *id.* at 303, 103 S.Ct. at 3016–17. He acknowledges that we have rejected a facial challenge to the constitutionality of the ACCA, *United States v. Gilliard*, 847 F.2d 21, 27 (1st Cir.1988), and instead questions only the constitutionality of the ACCA provisions as applied to him, given that his possessory offense involved only one bullet.

■■■ Although the Court in *Helm* stated that "[t]he constitutional principle of proportionality has been recognized explicitly in the Court for almost a century," *Helm*, 463 U.S. at 286, 103 S.Ct. at 3007–08, it also recognized that "prior convictions are relevant to the sentencing decision", *id.* at 296 n. 21, 103 S.Ct. at 3013 n. 21. Similarly, the Court's most recent examination of proportionality has, at the very least, cast doubt on the exact method by which a reviewing court should approach such challenges in non-capital cases. In the plurality opinion of *Harmelin v. Michigan*, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), two justices sought to limit proportionality review to capital cases only, *id.* at 994, 111 S.Ct. at 2701 (opinion of Scalia, J., joined by Rehnquist, C.J.), three justices recognized a "narrow proportionality principle," *id.* at 997, 111 S.Ct. at 2702 (opinion of Kennedy, J., joined by O'Connor and Souter, JJ.), and three justices dissented on the grounds that *Helm*'s three-factor proportionality review controlled, *id.* at 1021, 111 S.Ct. at 2715–16 (White, J., dissenting, joined by Blackmun

and Stevens, JJ.). We have interpreted *Harmelin* to require a defendant seeking proportionality review to demonstrate, at the threshold, an "initial inference of gross disproportionality," *Tart v. Commonwealth of Massachusetts*, 949 F.2d 490, 503 n. 16 (1st Cir.1991), between the "gravity of [the] criminal conduct and the severity of the ... penalty" imposed, *United States v. Bucuvalas*, 970 F.2d 937, 946 (1st Cir.1992). See *Harmelin*, 501 U.S. at 1005, 111 S.Ct. at 2707 (opinion of Kennedy, J.) ("[I]ntrajurisdictional and interjurisdictional analyses are appropriate only in the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality."); *United States v. Graciani*, 61 F.3d 70, 76 (1st Cir. 1995); *United States v. Saccoccia*, 58 F.3d 754, 788–89 (1st Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1322, 134 L.Ed.2d 474 (1996).

Thus, in *Graciani*, we upheld a 280–month sentence for the distribution of 85.3 grams of crack cocaine against a proportionality attack. 61 F.3d at 73, 77. Similarly, in *Saccoccia* we upheld a mandatory life sentence in a drug-money laundering scheme, stating that

Congress—not the judiciary—is vested with the authority to define, and attempt to solve, the societal problems created by drug trafficking across national and state borders. The Supreme Court has made it plain that the use of severe penalties as part of the legislative armamentarium does not constitute cruel and unusual punishment.

58 F.3d at 789.

Against this backdrop, we cannot say that Cardoza's sentence supports the necessary "inference of gross disproportionality." *Bucuvalas*, 970 F.2d at 946. Cardoza has not been sentenced to a 235–month incarceration solely because he was in possession of a single bullet, as his brief strenuously argues. Rather, he has been sentenced to such a term because (1) he was a convicted felon in possession of the bullet, and (2) he had previously been convicted of at least three violent felonies. Further, despite counsel for appellant's position at oral argument, a bullet is

not a "souvenir." It is a live round of ammunition capable of doing considerable harm when fired from a gun. With those clarifications in mind, the sentence imposed upon him under the ACCA recidivist statute does not give rise to an inference of constitutional infirmity. As we stated in *Gilliard*,

> The purpose of a recidivist statute ... is not to simplify the task of prosecutors, judges or juries. Its primary goals are to deter repeat offenders and, at some point in the life of one who repeatedly commits criminal offenses serious enough to be punished as felonies, to segregate that person from the rest of society for an extended period of time.... Like the line dividing felony theft from petty larceny, the point at which a recidivist will be deemed to have demonstrated the necessary propensities and the amount of time that the recidivist will be isolated from society are matters largely within the discretion of the punishing jurisdiction.

847 F.2d at 26 (quoting *Rummel v. Estelle*, 445 U.S. 263, 284–85, 100 S.Ct. 1133, 1144–45, 63 L.Ed.2d 382 (1980)). While it may be the case that reasonable persons will disagree as to the wisdom of the policy choice inherent in the imposition of a sentence such as this, such disagreements do not, in the instant case, give rise to constitutional concerns.

In the years preceding his conviction below, Cardoza had racked up at least three convictions for violent felonies in the state courts. Responding to the very problem presented by Cardoza's conduct, Congress decided to "infuse federal law enforcement into efforts at curbing and 'incapacitating' armed, habitual (career) criminals.'" *Id.* (alteration in original) (quoting H.R.Rep. No. 1073, at 2 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3661, 3662). Viewing, therefore, the total conduct for which Cardoza has been sentenced, we cannot find a supportable inference of gross disproportionality, and thus reject his Eighth Amendment challenge.

## B.

### Due Process

We note at the outset that Cardoza's due process challenge was not raised below. The only mention made of this challenge in the district court is by incantation of the term "Due Process" in Cardoza's objections to the PSR. It is well-settled that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.... It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work.·..." *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990). We therefore review Cardoza's claim for plain error. *United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770, 1776–77, 123 L.Ed.2d 508 (1993). It does not occupy our attention for long.

Cardoza bases his due process challenge on our decision in *United States v. Lombard*, 72 F.3d 170 (1st Cir.1995)(*Lombard* I). There, we vacated a sentence and remanded because the district court erroneously believed that it had no authority to depart downward, despite the substantial effect that consideration of previously acquitted conduct had on Lombard's sentence. *Id.* at 187. We were concerned that "the sentencing phase of the defendant's trial produced the conclusion he had committed murder and mandated imposition of a life sentence, but without the protections which normally attend the criminal process, such as the requirement of proof beyond a reasonable doubt." *Id.* at 179–80. Our decision was compelled by both the extreme facts and the determination that the "district court did not recognize its authority to consider whether a downward departure would have been appropriate....." *Id.* at 187. We were, however, clear that *Lombard* I is "an unusual and perhaps a singular case, at the boundaries of constitutional sentencing law, and does not provide an open door." *Id.* Indeed, following remand, we upheld the imposition of the same life sentence, after the district court recognized its authority to depart, and chose not to exercise it. *United States v. Lombard*, 102 F.3d 1, 2, 5 (1st Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 2437, 138 L.Ed.2d 197 (1997)(*Lombard* II).

None of the concerns animating our decision in *Lombard* I are present here. Most

importantly, the enhancement below was predicated on convictions that were obtained in state court, as opposed to the uncharged, indeed acquitted, conduct enhancements at play in *Lombard* I. And Cardoza does not suggest that he was denied any of the procedural protections found lacking in *Lombard* I. In short, we do not think this case lies, like *Lombard* I, "at the boundaries of constitutional sentencing law...." *Lombard* I, 72 F.3d at 187.[9]

Finally, Cardoza makes three brief arguments concerning the calculation of his criminal history. As Cardoza himself recognizes, however, resolution of any errors would not affect his sentence. We therefore need not reach them. We note only that should Cardoza return to the district court for resentencing, *see supra* note 8, this opinion does not preclude him from raising, at that time, his criminal history arguments.

### Conclusion

For the foregoing reasons, the convictions and sentence below are ***affirmed.***

---

9. Cardoza also makes vague allusions in his brief to double jeopardy and federalism concerns attendant in his sentence. These arguments are completely undeveloped, and are deemed waived. *See Zannino,* 895 F.2d at 17.