# United States Court of Appeals
## For the First Circuit

No. 07-2613

UNITED STATES,

Appellee,

v.

TYSON FORD,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Boudin, Stahl, and Howard,
Circuit Judges.

Allison J. Koury was on brief, for appellant.
Jack W. Pirozzolo, Assistant United States Attorney, with whom
Michael J. Sullivan, United States Attorney, was on brief, for
appellee.

November 5, 2008

**STAHL**, **Circuit Judge**.  Defendant-Appellant Tyson Ford appeals his conviction under the felon-in-possession statute, 18 U.S.C. § 922(g)(1).  His main complaint is that the district court erred in denying his motion to suppress a firearm found on his person because it was obtained during an unconstitutional search and seizure.  Finding no error, we affirm the conviction.

## I. Background

We relate the facts "'as the trial court found them, consistent with record support.'"  United States v. Ruidíaz, 529 F.3d 25, 27 (1st Cir. 2008) (quoting United States v. Lee, 317 F.3d 26, 30 (1st Cir. 2003)).  On September 8, 2005, Officers Daran Edwards and Daniel Griffin ("the Officers") of the Boston Police Department ("BPD") were on a routine patrol in a high-crime area of Dorchester, Massachusetts.  The Officers were in uniform and in a marked police cruiser.  They regularly patrolled the Dorchester area and were familiar with many of the area's residents.  At approximately 3:00 p.m., the Officers observed Ford, who they did not recognize, walking alone down Harvard Street.  Ford looked over his shoulder, observed the cruiser and then lowered his head, began walking rapidly, and turned right onto Gleason Street.  The Officers followed Ford the wrong way up Gleason Street for a short distance, ostensibly to conduct a Field Intelligence and Observation Report (FIO), used by BPD police officers for intelligence collection.

Upon coming abreast of Ford, Officer Griffin leaned out of the passenger side window and asked him, "Can I speak to you for a minute?" Ford stopped walking, took his identification out of his front pocket, and voluntarily handed it to Officer Griffin. He told the Officers he had no outstanding warrants and was not on probation. While Officer Edwards ran a search for warrants using the BPD database, Officer Griffin continued to ask Ford questions like "where do you live?" and "where are you headed?" Officer Griffin observed that Ford appeared annoyed, nervous, and hostile at times and that he was breathing rapidly, stuttered his words, and his hands shook. Officer Griffin asked Ford whether he had anything on him that the Officers needed to know about. Ford answered in the negative.

Roughly 45 seconds after taking Ford's driver's license, Officer Griffin exited the cruiser to complete the FIO. Following BPD protocol, Officer Edwards also exited, walked behind the cruiser, and approached Ford from the same direction as Officer Griffin. Neither Officer unholstered his weapon. Ford raised his hands into the air and said, "Come on man, what's this all about?" Officer Griffin asked whether Ford had any weapons on his person. Ford responded, "Yeah, I got a gun in my pocket, but it don't fire." The Officers then placed Ford in handcuffs, and Officer Griffin frisked him, discovering and seizing a Grendel, Inc., P-12 .380 semi-automatic handgun from the pocket of Ford's pants. The

Officers arrested Ford, the entire encounter lasting approximately two to three minutes from interception to arrest. Before placing Ford in handcuffs, neither Officer had touched Ford, drawn his weapon, or told Ford he was not free to leave nor had the Officers activated the police cruiser's siren or flashing lights.

On November 1, 2005, a single-count complaint charged Ford as a felon-in-possession of a handgun in violation of 18 U.S.C. § 922(g)(1). On March 3, 2006, Ford moved to suppress the evidence seized in the warrantless search of his person, contending he was seized at the time the Officers exited the vehicle in violation of his Fourth Amendment rights. On July 20, 2006, the district court denied the motion and issued a well-reasoned rescript, finding that the Officers had not seized Ford prior to his incriminating statement. See United States v. Ford, 440 F. Supp. 2d 16 (D. Mass. 2006).

On October 4, 2006, Ford entered a conditional plea of guilty, see Fed. R. Crim. P. 11(a)(2), reserving his right to appeal the denial of his suppression motion. On October 11, 2006, the district court sentenced Ford to a term of imprisonment of 15 years under the Armed Career Criminal Act, 18 U.S.C. § 924 (e)(1). Ford now appeals the denial to suppress the handgun and his conviction.[1]

---

[1] Ford dropped his appeal of the sentence enhancement under the Armed Career Criminal Act, 18 U.S.C. § 924(e)(1).

## II. Discussion

### A. The Motion to Suppress

This appeal primarily concerns the boundary delineating casual encounters with police, as when officers question persons in public places, from seizures requiring probable cause or articulable suspicion. See United States v. Young, 105 F.3d 1, 5-6 (1st Cir. 1997). Ford challenges the lower court's denial of his motion to suppress in which he argued the Officers seized him before possessing the requisite reasonable suspicion. The Government concedes, and we accept for the purposes of this review, that the Officers lacked the reasonable suspicion required for a seizure and that, if a seizure occurred, the handgun found on Ford's person "must be suppressed as tainted fruit." See Florida v. Bostick, 501 U.S. 429, 433-34 (1991).

"Our review of a district court's denial of a suppression motion is bifurcated." United States v. Cardoza, 129 F.3d 6, 13 (1st Cir. 1997). We review the court's factual findings for clear error and its legal conclusions (including constitutional determinations) de novo. Ruidíaz, 529 F.3d at 28. Clear error "'exists only if, after considering all of the evidence, we are left with a definite and firm conviction that a mistake has been made.'" Young, 105 F.3d at 5 (quoting United States v. McCarthy, 77 F.3d 522, 529 (1st Cir. 1996)). This deference "reflects our

awareness that the trial judge . . . sits in the best position to determine what actually happened." Id.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const., amend. IV. The primary purpose of the Fourth Amendment is "'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.'" I.N.S. v. Delgado, 466 U.S. 210, 215 (1984) (quoting United States v. Martinez-Fuerte, 428 U.S. 543, 554 (1976)).

Not every interaction between a police officer and a citizen constitutes a seizure triggering Fourth Amendment protections. Bostick, 501 U.S. at 434; Cardoza, 129 F.3d at 14; Young, 105 F.3d at 5. While per se rules are inappropriate in determining when a seizure occurs for Fourth Amendment purposes, United States v. Drayton, 536 U.S. 194, 201 (2002) (citing Bostick, 501 U.S. at 439), we have observed that encounters "between law enforcement officials and citizens generally fall[] within three tiers of Fourth Amendment analysis, depending on the level of police intrusion into a person's privacy." Young, 105 F.3d at 5. Because there are no bright-line distinctions between the tiers, we look to the totality of the circumstances to determine where a police encounter falls. Drayton, 536 U.S. at 207; Michigan v.

Chesternut, 486 U.S. 567, 572 (1988); United States v. Smith, 423 F.3d 25, 29-30 (1st Cir. 2005); Cardoza, 129 F.3d at 15. See also Bostick, 501 U.S. at 439-40 (rejecting per se rule for seizure in favor of totality inquiry).

The lowest tier, which does not implicate the Fourth Amendment, involves minimally intrusive interactions such as when police officers approach individuals on the street or in public places to ask questions. Young, 105 F.3d at 5-6; Bostick, 501 U.S. at 434. See Drayton, 536 U.S. at 201 (observing that law enforcement agents may question and ask a citizen for identification even when they have no basis to suspect the individual so long as they "do not induce cooperation by coercive means"). If the encounter amounts to more than a minimally intrusive interaction, a seizure occurs, either a de facto arrest requiring probable cause or an investigative (or Terry) stop necessitating reasonable suspicion. Young, 105 F.3d at 6.

The Supreme Court has adopted the standard set forth by Justice Stewart's plurality opinion in United States v. Mendenhall, 446 U.S. 544, 554 (1980), that "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would

have believed that he was not free to leave."[2]  See Drayton, 536 U.S. at 202; California v. Hodari D., 499 U.S. 621, 627-28 (1991) (compiling cases).  To constitute seizure, this Circuit requires one's liberty be restrained by either physical force or an assertion of authority.  Id. at 626; United States v. Sealey, 30 F.3d 7, 9 (1st Cir. 1994); see Smith, 423 F.3d at 28 (finding seizure can occur without physical restraint if compliance is coerced and not voluntary).

Under the objective totality of the circumstances standard, we look not to "whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." Hodari D., 499 U.S. at 628; Chesternut, 486 U.S. at 574 (noting objective standard does not vary with mind of each individual). Thus, there is less reason to inquire into a defendant's subjective mindset when considering whether there is a submission to authority, see Cardoza, 129 F.3d at 14 n.4, particularly as all persons feel "some degree of compulsion" and "discomfort" when approached by police officers.  Smith, 423 F.3d at 28.[3]

_____

[2] The Court has explained the reasonable person test presumes an innocent person.  Bostick, 501 U.S. at 438; Smith, 423 F.3d at 31, n.5.

[3] Both the Supreme Court and this Circuit have observed that exchanges do not lose their consensual nature simply because people generally answer police officers' questions.  Drayton, 536 U.S. at 205 (citing Delgado, 466 U.S. at 216); Cardoza, 129 F.3d at 16 (agreeing with defendant that "few people . . . would ever feel

Employing this objective test, the inquiry before us today is not whether the Officers could approach and question Ford, but, instead "whether they did so in a manner that would have communicated to a reasonable person that he was not free to refuse to answer and walk away." Smith, 423 F.3d at 29. To elucidate this test, the Supreme Court has provided circumstances that may indicate a seizure including "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." Mendenhall, 446 U.S. at 554. "[T]his list of factors is not exhaustive and no single factor is dispositive in any case." Smith, 423 F.3d at 29. See Chesternut, 486 U.S. at 575 (considering also non-use of patrol car's siren or flashers); United States v. McKoy, 428 F.3d 38, 40 (1st Cir. 2005) (adding neighborhood as "only one factor that must be looked at alongside all the other circumstances").

To evaluate the circumstances leading to Ford's arrest, our case law provides guidance for discerning the Fourth Amendment's parameters. In Cardoza, police officers drove the

---

free to walk away from any police question"). See id. ("The 'free to walk away' test . . . must be read in conjunction with the Court's frequent admonitions that 'a seizure does not occur simply because a police officer approaches an individual and asks a few questions'") (quoting Bostick, 501 U.S. at 434, and Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968)).

wrong way on a one-way street to ask the defendant pointed questions including "Why are you out at this time of night?" 129 F.3d at 15. We found no seizure, noting the police had not used the cruiser's siren or lights, had stopped at the curb before calling out to the defendant, and did not exit the car until they observed the defendant's ammunition round. Id. at 16. Cf. Chesternut, 486 U.S. at 575 (no seizure where police did not activate siren or lights, did not order defendant to halt, drew no weapons, and did not block defendant's course).

In Smith, the police officers framed general, non-threatening questions to ask why the defendant was sitting on the wall of a stranger's house and did not command the defendant to remain on his walled perch. 423 F.3d at 30. Even after the officers exited their vehicle to conduct an FIO and approached the defendant from both sides, we found no seizure because the officers never summoned Smith to the cruiser, did not employ the car's siren or lights, and did not expose their weapons or touch Smith. Id. Additionally, because Smith attempted to flee from the officers after he disclosed that he had an outstanding warrant, we noted his action indicated he had not submitted to an assertion of authority. Id. at 31.

Applying this precedent to the instant case, we decline to hold that the Officers seized Ford before he disclosed that he was in possession of a firearm. See Mendenhall, 446 U.S. at 555

-10-

(rejecting proposition that making statements contrary to one's self-interest necessarily indicates involuntary submission). The Officers, like those in Cardoza, drove a short distance the wrong way on Gleason Street for the purpose of asking Ford questions but activated neither the cruiser's siren or flashing lights. Their questions were largely general and non-threatening, like those in Smith. Throughout the brief encounter, until Ford's incriminating statement, the Officers did not draw their guns or touch Ford.

At the onset of the interaction, Ford approached the cruiser and provided his driver's license voluntarily. While the Officers retained the license during the two- to three-minute exchange, they did not otherwise restrict Ford's movement. Contrast Smith, 423 F.3d at 27, 30 (finding no seizure where officers approached the defendant from both sides, telephone pole was directly in front of defendant, and wall directly behind). As in Smith, where we found no seizure, the Officers exited the cruiser to complete the FIO.

Ford relies on the Supreme Court's Florida v. Royer decision where two detectives retained the defendant's driver's license and airplane ticket while commanding him to accompany them to a private room because they believed he fit the drug courier profile. 460 U.S. 491, 493-94 (1983). The Court held these actions constituted an illegal seizure, id. at 501-02, and distinguished Mendenhall in part because the government agents

-11-

there immediately returned the driver's license and airplane ticket before continuing the encounter.  Id. at 503 n.9.

Ford argues Royer indicates that the retention of his driver's license during the encounter is compelling evidence of a seizure.  We think the concerns of the airport cases, where citizens need documentation to move from place to place, differ from the instant case where Ford was on foot on a public street. See Drayton, 536 U.S. at 204 (noting that if the encounter had occurred on the street rather than on a bus, "[i]t is beyond question that . . . it would be constitutional").  Moreover, Ford produced his license voluntarily, not at the request of one of the Officers, and was not removed from the street to a confined space while the Officers ran the background check.

While the retention of Ford's license is an important factor in our analysis, we decline to elevate it above other considerations.  See United States v. Weaver, 282 F.3d 302, 313 (4th Cir. 2002) (refusing to adopt D.C. Circuit's per se rule regarding license retention).

Ford also asserts that a seizure can be evidenced by his raising his hands into the air after the Officers exited the cruiser. But one can draw different inferences from this gesture; while it could reflect submission, raised hands also can be a

symbol of protest. On the cold record before us,[4] we cannot recreate the actual gesture demonstrated to the district court. Instead, this type of inquiry recommends our deferential review of the lower court's factual findings.[5]

Evaluating the totality of circumstances, we hold that Ford was not seized for purposes of the Fourth Amendment protections when he told the Officers he possessed a handgun. Assessments of this type "are highly fact-specific and must be performed on a case-by-case basis." United States v. Taylor, 511 F.3d 87, 92 (1st Cir. 2007). We acknowledge this method of analysis does not produce a crystalline landscape in our Fourth Amendment jurisprudence. But it reflects most realistically the contextual nature of these encounters. See Chesternut, 486 U.S. at

---

[4] At the suppression hearing, Officer Edwards demonstrated the exact manner in which Ford raised his hands and later explained that Ford "raised his hands in the air." Officer Griffin similarly testified twice that Ford "raised his hands." Ford did not testify. We note that this record does not support the suggestion initially posited by Ford that he raised his hands above his head.

[5] Ford also suggests that the Officer's failure to inform him of his right to refuse to answer questions and to leave rendered the encounter nonconsensual. While it is true that such statements generally make an encounter consensual, Mendenhall, 446 U.S. at 558-59, the Supreme Court has explained that a seizure determination "is not affected by the fact that the respondent was not expressly told by the agents that she was free to decline to cooperate with their inquiry, for the voluntariness of her responses does not depend upon her having been so informed." Id. at 555. See also Drayton, 536 U.S. at 206 ("The [Supreme] Court has rejected in specific terms the suggestion that police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search.").

-13-

573 ("The test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation.").

**B. Other Issues**

Ford contests his conviction under 18 U.S.C. § 922(g)(1), asserting that the handgun on his person did not fall under the statutory definition of "firearm" because it was inoperable. The Government argues that Ford waived this argument by entering a conditional plea of guilty, reserving only his objection to the suppression order. Fed. R. Crim. P. 11(a)(2). Regardless of the standard of review we employ, Ford's claim is without merit.

"The term 'firearm' means (A) any weapon . . . which will or is designed to or may readily be converted to expel a projectile by action of an explosion." 18 U.S.C. at § 921(a)(2). We have recognized that, in order to convict, "the gun must be real, but it 'need not be prove[d] to be loaded or operable.'" United States v. Taylor, 54 F.3d 967, 975 (1st Cir. 1995) (quoting United States v. Kirvan, 997 F.2d 963, 966 (1st Cir. 1993)). See also United States v. Alston, 112 F.3d 32, 38 (1st Cir. 1997). No one, including Ford, suggests the handgun he carried was not real or that it was not designed to expel a projectile. Ford's argument thus fails.

Finally, Ford's argument that his prior convictions should be treated as an element of the enhanced offense, and thus

-14-

proven by the Government beyond reasonable doubt, is foreclosed by Almendarez-Torres v. United States, 523 U.S. 224 (1998), and our Circuit's subsequent case law.

## III. Conclusion

For the foregoing reasons, we affirm the district court's denial of Ford's motion to suppress and Ford's conviction under 18 U.S.C. § 922(g)(1).