In the

# United States Court of Appeals

## For the Seventh Circuit

No. 05-2608

UNITED STATES OF AMERICA.

*Plaintiff-Appellee,*

*v.*

VEIL V. DOUGLASS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 04-30064-001—**Jeanne E. Scott**, *Judge.*

ARGUED AUGUST 9, 2006—DECIDED OCTOBER 30, 2006

Before POSNER, COFFEY, and EASTERBROOK, *Circuit Judges.*

COFFEY, *Circuit Judge.*  A gun was found on the ground along the path Veil Douglass had traveled while fleeing from police officers who had approached him to investigate information they had received from an anonymous caller. The officers recovered the gun, and Douglass was charged with possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1). He moved to suppress the weapon he was believed to have possessed, arguing that its discovery resulted from what he alleges was an investigatory detention initiated without a reasonable suspicion. The district court denied his motion to suppress, he went to trial, and a jury found him guilty. He was sentenced to

210 months' imprisonment to be followed by a five-year term of supervised release. On appeal Douglass challenges the denial of his motion to suppress and renews his contention that the officers had seized him without reasonable suspicion before they found the gun. We affirm.

## I. Background

On the night of August 20, 2004, at approximately 2:30 a.m., while police officers James Oliver and Don Mumaw were on routine patrol duty in Springfield, Illinois, they received a dispatch from the control center of a physical assault. The information relayed referred to an anonymous caller who had reported observing several males battering a female next to a dark-blue car with Illinois license plate number 7447568, parked in a parking lot at 2836 Stanton Street in Springfield, Illinois. The officers responding to the call arrived at the parking lot four or five minutes after receiving the dispatch. Although the lot was poorly lit, the officers observed a man standing alone next to a vehicle matching the description of the vehicle, including the license plate number, referred to in the call. At this point the officers noticed that the car's engine was running and the lights were on.

Oliver and Mumaw recognized the man, Douglass, and the vehicle because they had seen him operating it in the neighborhood on prior occasions. Mumaw also knew of his criminal history and was well aware that it included a homicide conviction. Mumaw, a member of the police department's Emergency Response Team, had a month earlier participated in the execution of a search warrant at a residence believed to have been occupied by Douglass. The record is barren of any information concerning the results of that search.

By the time Officer Mumaw drove the squad car into the parking lot, Douglass had moved from his position standing

near the car to sitting in the driver's seat. Mumaw parked fifteen to twenty feet from Douglass, with the cars facing each other "nose-to-nose." The officers exited their squad car and proceeded towards Douglass's car. Oliver approached the driver's side while Mumaw approached the passenger side. Oliver asked Douglass for identification and whether he knew anything about a fight in the parking lot. Douglass refused to answer and remained silent as he repeatedly moved his hand from the steering wheel to the gear shift lever. While Mumaw was shining his flashlight into Douglass's car, he spotted a live round of .380 caliber ammunition on the floorboard under Douglass's feet. Mumaw yelled to Oliver "10-32," the police code for a gun.

After drawing his own gun for his own protection, Oliver ordered Douglass out of the car. Douglass seemed to be looking around possibly for an escape route and kept repeating, "no, I can't, no, I can't." When Oliver realized Douglass was not getting out of the car, he attempted to open the door and pull Douglass out, but found it locked. Oliver immediately reached through the partially opened window and sprayed Douglass in the face with pepper spray to momentarily blind him in order that he might reach inside and unlock the door. Before Oliver could unlock the door, Douglass put his vehicle in gear. According to Oliver, Douglass drove around the squad car "in a split second" and exited the parking lot. The officers jumped in their squad car and gave chase.

Douglass was about a block away when he drove his car off the road. He leaped out of the car and started running away. The officers had arrived at this point and pursued him on foot and ordered him to stop. Shortly thereafter, Douglass decided to give up, reversed his course, and started walking back toward the officers. Oliver and Mumaw forced him to the ground and handcuffed him. They searched Douglass but discovered no weapons on his person. As he lay on the ground, Douglass complained of having a

seizure and asked the officers to get his medication from his car. The officers called for an ambulance, and Mumaw agreed to look for the medication. He went back to the area where Douglass had abandoned his car, and at this time he discovered a round of live ammunition on the driver's seat in addition to the round he had previously observed on the floor of the vehicle. Retracing the path of Douglass's car, Mumaw also discovered a Jennings Bryco .380 caliber pistol lying near the curb about thirty feet from where Douglass's car had stopped, though neither officer remembered seeing Douglass throw anything out of the window. It had been drizzling that night, but in spite of the rain the pistol was dry, as if it had just been placed there.

Douglass moved to suppress the introduction of any evidence concerning the gun and argued that the officers discovered the weapon only after seizing him without reasonable suspicion. The trial court denied Douglass's motion. The court reasoned that, if there had been a detention before the sight of a bullet prompted the officers to order Douglass out of his car, that detention had been "very, very brief" and was "supported by an objectively reasonable, articulable suspicion on the part of the officers that criminal activity was afoot in that parking lot." The trial judge remarked that the officers certainly, as a result of the information received in the anonymous call, had an obligation to investigate whether a woman was being beaten in the parking lot and credited them with having performed "good police work." Based on the facts presented, the court denied Douglass's motion.

## II. Discussion

In this appeal Douglass challenges the suppression ruling by arguing that he was already seized within the meaning of *Terry v. Ohio*, 392 U.S. 1 (1968), before the officers even requested identification. According to Douglass, the officers

seized him when they parked their car in front of his, approaching him on foot from two sides, and shining their flashlights in his car. The government's response is that the initial encounter was consensual (because Douglass remained in his car while the officers approached) and the alleged detention was too brief for it to have been a seizure before Officer Mumaw saw the ammunition that, combined with the information from the anonymous call, amounted to reasonable suspicion resulting in probable cause. Since the facts underlying the encounter are undisputed, we review the legal question de novo. *Ornelas v. United States*, 517 U.S. 690, 691 (1996).

The Fourth Amendment is not triggered when law enforcement officers merely approach an individual in a public place and ask a few questions. *See United States v. Drayton*, 536 U.S. 194, 200 (2002). That is exactly what happened here, considering the brevity and unintrusive nature of the encounter. Only a few moments had passed between the officers' approach and Mumaw's discovery of the ammunition in Douglass's vehicle. *See United States v. Goodwin*, 449 F.3d 766, 768 (7th Cir. 2006) (holding an encounter too brief in time to amount to seizure of defendant); *United States v. Broomfield*, 417 F.3d 654, 656-57 (7th Cir. 2005) (concluding that the record reflected that the encounter lasted only seconds before the police officer developed probable cause, thus not a seizure). At this point the officers had not drawn their weapons, and the fact that the officers used their flashlights is insignificant and certainly is not a reason that would have caused a reasonable person to feel compelled to remain for it was 2:30 a.m. in a dark parking lot. *See United States v. Wade*, 400 F.3d 1019, 1022 (7th Cir. 2005) (noting that officer's decision to move to better-lit area of train station would not affect whether a reasonable person felt free to leave). Nor did the officers' stance on either side of Douglass's car convert the encounter into a seizure because he still could have declined

to answer their questions and driven away (as he ultimately did); he was thus free to leave. *See id.* at 1023. While it is possible for the officers to have blocked a suspect's car so that he does not feel free to leave, *see United States v. Burton*, 441 F.3d 509, 510-11 (7th Cir. 2006), Douglass was not so restricted with the squad car parked some twenty feet away. He was not blocked in on three sides, or even two*, see id.* (holding that suspect was seized when surrounded by bicycle cops on three sides of car); *United States v. Packer*, 15 F.3d 654, 657 (7th Cir. 1994) (deciding that officers effected seizure when they parked in front of and behind suspect's car); *United States v. Pavelski*, 789 F.2d 485, 488-89 (7th Cir. 1986) (holding that suspect was not seized when police parked behind and on one side of his car but was seized when police parked third car in front of suspect's car); rather, a single squad car was parked fifteen to twenty feet away from the front of Douglass's car, *see United States v. Hendricks*, 319 F.3d 993, 1001 (7th Cir. 2003) (holding that officer's parking of car fifteen feet behind suspect's did not block suspect's exit and did not make encounter a seizure). We hold that a reasonable person would have felt free to leave, as is evidenced by the fact that Douglass *did* in fact flee from the scene and lead the officers on a chase. In substance, the brief encounter that occurred between Officer Oliver's questioning and Officer Mumaw's development of probable cause did not amount to a seizure.

Douglass falls back on his argument that, even if he was not seized before Officer Mumaw saw the ammunition inside the car, that discovery alone did not give the officers probable cause to arrest him. To have developed probable cause, he continues, the officers first had to ascertain whether he fell within an exception to the federal or Illinois statutes barring felons from possessing ammunition, *see* 18 U.S.C. § 921(a)(20); 720 Ill. Comp. Stat. 5/24-1.1(a). But establishing probable cause does

not require police officers to anticipate all possible defenses to seemingly criminal activity. *See Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979) ("The validity of the arrest does not depend on whether the suspect actually committed a crime; the mere fact that the suspect is later acquitted of the offense for which he is arrested is irrelevant to the validity of the arrest."); *United States v. Osborn*, 120 F.3d 59, 62-63 (7th Cir. 1997). They had personal knowledge that Douglass was a felon, that he was driving a car identified by license plate in an anonymous call concerning an assault, and observed ammunition on the floor of his vehicle; that was sufficient. *See Broomfield*, 417 F.3d at 656-57. Moreover, Douglass fled immediately after the officers ordered him out of the car, so his arrest—the first point at which he submitted to a show of authority—did not come until later when he finally abandoned his flight. *See Cal. v. Hodari D.*, 499 U.S. 621, 628-29 (1991); *McCoy v. Harrison*, 341 F.3d 600, 605 (7th Cir. 2003). And by then the officers could take his flight into account, the information relayed in the anonymous call, as well as traffic offenses that independently justified his arrest. *See Whren v. United States,* 517 U.S. 806, 812-13 (1996); *United States v. Hernandez-Rivas*, 348 F.3d 595, 599 (7th Cir. 2003).

AFFIRMED.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*

USCA-02-C-0072—10-30-06