HARTZ, Circuit Judge,
concurring:
At 10:30 p.m. on New Year’s Eve, six officers of the Oklahoma City Police Gang Enforcement Unit, traveling in four patrol cars, converged on the parking lot of Slick Willie’s Pool Hall. At the request of Slick Willie’s, officers often patrolled the parking lot, particularly on weekends, because of problems there with assaults and fights. There had been a shooting there in early September. In the words of the district court, Slick Willie’s was “beyond any question ... a place that is-very productive of criminal activity [,] ... a place where arrests take place [,] ... a place where narcotics, are dealt ” and “a high-crime location.... that is frequently in need of law enforcement attention.” R., Vol. 3 at 101 (Transcript).
There were four entrances to the parking lot. Officer Monte Stephens, accompanied by Sergeant Michael Anderson, drove his patrol car through the southwest entrance to check out that part of the parking lot while the other officers checked elsewhere. They promptly saw a Chrysler 300 with two occupants in the front seats. Because the lot was not well lit, Officer *1129 Stephens turned on his ear’s spotlight; his emergency lights were not activated. The Chrysler was backed into a parking space, blocked on all sides except its front. Officer Stephens stopped the patrol car far enough away from the Chrysler so as not to block its path. He and Sergeant Anderson then walked “resolutely” toward the Chrysler, R., Vol. 1 at 54 (District Court Order), blocking any escape route for the vehicle. Defendant was in the driver’s seat and a woman sat beside him. Although there were four other officers and three other patrol cars in other areas of the parking lot, the district court found that their presence did not “contribute[ ], in any way that is significant for present purposes, to [Defendant’s] perception of his situation—and his responses, to that perception.” Id. at 51 n.3.
In my view, this conduct by the two officers did not constitute a seizure of Defendant. Nothing they did amounted to.an assertion of authority, directing the occupants of the vehicle that they could not depart. There was no forcible restraint, no threat or command, no drawing of a weapon, and no activation of emergency lights. They merely took prudent steps to safely initiate a consensual investigation. If the officers’ actions had to be supported by reasonable suspicion or probable cause, it is hard to see how the police can conduct patrols involving consensual conversations in high-risk areas.
Supreme Court precedent does not support the conclusion that Defendant was seized before the officers arrived at his car. A brief review of the Court’s doctrine will put this case in context.
The Supreme Court first declared in Terry v. Ohio, 392 U.S. 1, 19 n.16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), that a seizure occurs “[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen.” The Court did not, however, define show of authority. Not until 1980 did the generally accepted formulation appear, although not in binding precedent. In United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), Justice Stewart, joined only by then-Justice Rehnquist, recognized the. competing interests at stake. He wrote, “The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.” Id. at 553-54, 100 S.Ct. 1870. “[Characterizing every street encounter between a citizen and the police as a ‘séizure,’” he continued, “while not enhancing any interest secured by the Fourth Amendment, would impose wholly unrealistic restrictions upon a wide variety of legitimate law enforcement practices.” Id. at 554, 100 S.Ct. 1870. He concluded that a seizure' occurs “only if, iri view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was riot free to leave.” Id.
This feel-free-to-leave standard has now been adopted by the Court to resolve whether a seizure occurs when police actions “do not show an unambiguous attempt to restrain or when an individual’s submission to a show of governmental authority takes the form of passive acquiescence.” Brendlin v. California, 551 U.S. 249, 255, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007). But the test has been tweaked for those occasions when “a person has no desire to leave for reasons unrelated to the police presence”; in that circumstance, the proper test is not the free-to-leave test but whether a reasonable innocent person “would feel free to decline the officers’ requests or otherwise terminate the encounter.” Id. (internal quotation marks omitted); see Florida v. Bostick, 501 U.S. 429, 438, 111 S.Ct. 2382, 115 L.Ed.2d 389 *1130 (1991) (“the ‘reasonable person’ test presupposes an innocent person”).
It is hardly obvious, however, how to determine whether a reasonable innocent person would feel free to leave or to decline a request. For a variety of reasons, most people will not “feel” free to leave or refuse a request when confronted by a police officer. After all, “ ‘[implicit in the introduction of the officer and the initial questioning is a show of authority to which the average person encountered will feel obliged to stop and respond.’ ” LaFave, 4 Search and Seizure § 9.4(a) (5th ed.) (original brackets omitted) (quoting Illinois Migrant Council v. Pilliod, 398 F.Supp. 882, 899 (1975)). Thus, “if the ultimate issue is perceived as being whether the suspect ‘would feel free to walk away,’ then virtually all police-citizen encounters must in fact be deemed to involve a Fourth Amendment Seizure.” Id. (footnote omitted) (stating that the free-to-leave standard “should not be given such a literal reading”). We must therefore look to the Supreme Court’s application of the test for more specific guidance.
In some circumstances it is obvious that officers, without uttering any words, are exercising their authority—ordering compliance from civilians. It should be no surprise that the Supreme Court has held that use of a roadblock or emergency lights ordinarily constitutes a seizure. See, e.g., Brower v. County of Inyo, 489 U.S. 593, 599, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989) (seizure where vehicle stopped by police roadblock); United States v. Cortez, 449 U.S. 411, 415, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981) (seizure where vehicle intercepted with emergency lights). Likewise, there is generally a seizure when officers retain the civilian’s property with no indication that he or she can have it back before complying with the officers’ requests. In Florida v. Royer, 460 U.S. 491, 493-94, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (prevailing plurality opinion by Justice White), two plainclothes detectives had an encounter with the defendant in an airport concourse. While it was permissible for the detectives to approach and question the defendant, and to request and examine his driver’s license and plane ticket, the prevailing plurality of the Court held that there was a seizure once “the officers identified themselves as narcotics agents, told [the defendant] that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver’s license and without indicating in any way that he was free to depart.” Id. at 501, 103 S.Ct. 1319.
On the other hand, “[Supreme Court] cases make it clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions.” Bostick, 501 U.S. at 434, 111 S.Ct. 2382. And the Court has explained that the free-to-leave standard does not require that the average person be equally likely to stay or leave:
While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response. Unless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in the detention under the Fourth Amendment.
I.N.S. v. Delgado, 466 U.S. 210, 216, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984) (citations omitted). The Supreme Court has thus granted wide latitude for police attempts at voluntary contact. In Delgado the Court considered “factory surveys” by immigration agents. Id. at 212, 104 S.Ct. 1758. The majority did not dispute the following de *1131 scription in Justice Brennan’s opinion dissenting on the seizure issue:
First, as the respondents explained, the surveys were carried out by surprise by relatively large numbers of agents, generally from 15 to 25, who moved systematically through the rows of workers who were seated at their work stations. Second, as the INS agents discovered persons whom they suspected of being illegal aliens, they would handcuff these persons and lead them away to waiting vans outside the factory. Third, all of the factory exits were conspicuously guarded by INS agents, stationed there to prevent anyone from leaving while the survey was being conducted. Finally, as the INS agents moved through the rows of workers, they would show then-badges and direct pointed questions at the workers.
Id. at 230, 104 S.Ct. 1758 (Brennan, J., concurring in part and dissenting in part) (citations omitted). In Justice Brennan’s view, it was “simply fantastic to conclude that a reasonable person could ignore all that was occurring throughout the factory and ... have the temerity to believe that he was at liberty to refuse to answer their questions and walk away.” Id. But the Court held that the factory workers were not seized. Id. at 218, 104 S.Ct. 1758. It discounted the dissenters’ concern with the stationing of agents near factory exits because the restrictions on the workers’ freedom to move were a result of their work obligations and the workers “were not prevented by the agents from moving about the factories.” Id. The presence of agents at the doors was merely “to insure that all persons in the factories were questioned.” Id. “This conduct should have given [the workers] no reason to believe that they would be detained if they gave truthful answers to the questions put to them or if they simply refused to answer.” Id. And “the mere possibility that they would be questioned if they sought to leave the buildings should not have resulted in any reasonable apprehension by any of them that they would be seized or detained in any meaningful way.” Id. at 219, 104 S.Ct. 1758.
In Michigan v. Chesternut, 486 U.S. 567, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988), the Supreme Court found no seizure even though the officers were clearly intent on speaking to the defendant. When the defendant saw officers in a police cruiser approaching an intersection, he promptly turned and began to run. Id. at 569, 108 S.Ct. 1975. The cruiser caught up to him and drove alongside him. Id. The Court acknowledged that “[w]hile the very presence of a police car driving parallel to a running pedestrian could be somewhat intimidating, this kind of police presence does not, standing alone, constitute a seizure.” Id. at 575, 108 S.Ct. 1975. It noted that there was nothing in the record reflecting “that the police activated a siren or flashers; or that they commanded [the defendant] to halt, or displayed any weapons; or that they operated the car in an aggressive manner to block [the defendant’s] course or otherwise control the direction or speed of his movement.” Id. Thus, “the police conduct involved here would not have communicated to the reasonable person an attempt to capture or otherwise intrude upon [the defendant’s] freedom of movement.” Id. at 575, 108 S.Ct. 1975. The conduct was not “so intimidating that [the defendant] could reasonably have believed that he was not free to disregard the police presence and go about his business.” Id. at 576, 108 S.Ct. 1975 (internal quotation marks omitted).
A third informative opinion is United States, v. Drayton, 536 U.S. 194, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002). Three police officers boarded a bus as part of a routine drug and weapons interdiction. Id. at 197, 122 S.Ct. 2105. One knelt on the front *1132 driver’s seat and faced the rear; he did not block the aisle or otherwise obstruct the bus exit. Id. at 197-98, 122 S.Ct. 2105. A second officer was at the rear of the bus, facing forward. Id. at 198, 122 S.Ct. 2105. The third worked his way from the back toward the front of the bus, speaking individually with the passengers as he went. Id. The Court stated that “the traditional rule, which, states that a seizure does not occur so long as a reasonable person would feel free to disregard the police and go about his business, is not an accurate measure of the coercive effect of a bus encounter,” Id. at 201, 122 S.Ct. 2105 (internal quotation marks omitted). The passenger’s freedom of movement might be confined in that he or she may not want to leave the bus because of the risk that it would depart without him or her, “but this is the natural result of choosing to take the bus; it says nothing about whether the police conduct is coercive.” Id. at 201-02, 122 S.Ct. 2105, The proper test, then, should be “whether a reasonable person would feel free to decline the officers’ requests or otherwise terminate the encounter;” Id, at 202, 122 S.Ct, 2105. Under that test, there was no seizure. See id. at 203, 122 S.Ct.. 2105. The encounter was not coercive because “[t]here was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice.” Id. at 204, 122 S.Ct. 2105. That the officers wore sidearms was of no importance; it is well-known that officers are usually armed, so “[t]he presence of a holstered firearm ... is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon.” Id. at 205, 122 S.Ct. 2105. As in Delgado, the Court recognized that few passengers in that circumstance would refuse to cooperate. But they do so not because of coercion but because they “know that their participation enhances their own safety and the safety of those around them.” Id. at 205,122 S.Ct. 2105.
The common thread in these cases is that a reasonable person would not feel coerced when officers are simply engaging in reasonable actions to conduct a consensual encounter. The operation may require multiple officers so that they can safely engage with what may be a number of people (as in Delgado and Drayton) and they may even stand at exits so they can be sure that they have the chance to address everyone present (again, as in Delgado and Drayton), But if the officers are not taking actions inconsistent with seeking a, consensual encounter—such as using a siren or emergency lights, brandishing weapons, or speaking peremptorily—a reasonable person would feel free to refuse to cooperate.
Justice Stewart offered a few factors supporting the finding of a seizure in his opinion in Mendenhall, 446 U.S. at 554, 100 S.Ct. 1870: “the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer’s request might be compelled.” But none of those factors is independently dispositive. “[W]hat constitutes a restraint on liberty prompting a person to conclude that he is not free to ‘leave’ will vary ... with the setting in which the conduct occurs.” Chesternut, 486 U.S. at 573, 108 S.Ct. 1975. We must “assess, the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation.” Id. On the only occasion on which the Supreme Court invoked the factors recited by Justice Stewart in Mendenhall to find a seizure, the Court said that.there was “evidence of every one of the probative circumstances mentioned”; and there was more besides. Kaupp v. Texas, 538 *1133 U.S. 626, 631, 123 S.Ct. 1843, 165 L.Ed.2d 814 (2003) (17-year-old boy was awakened in his bedroom by at least three officers, taken out in handcuffs in his underwear in January, and driven away in a patrol car).
What is the context here? Six officers were patrolling at night a dimly lit location known for violence and criminal activity. Their number was prudent, given the safety risk and the advantages of being able to approach several persons across a sizable parking lot at the same time. They used their lights to illuminate the interiors of vehicles so that they could see whether the vehicles were occupied and, if so, what was going on. When they saw someone, they approached in pairs. They did not turn on their emergency lights, brandish weapons, establish a checkpoint, or issue orders. If there' is a less “intrusive” way to safely and effectively patrol such an area and conduct consensual interviews, it is not apparent to me. If reasonable suspicion is necessary to conduct such an operation, then officers could' likely patrol such a location only after a reliable report of a criminal offense.
Considered in that light, the reasonable person contemplated by Supreme Court precedent would understand that the police were not compelling anyone to do anything. The person would not feel coerced by the police activity and “would feel free to decline the officers’ requests or otherwise terminate the encounter.” Brendlin, 551 U.S. at 255, 127 S.Ct. 2400 (internal quotation marks omitted). True, almost any innocent person approached by officers in this situation would feel like complying. But that was equally true on the factory floors in Delgado and the bus in Drayton. What is missing here is any police conduct that conveys compulsion. I fail to see how, as the dissent puts it, “the officers specifically targeted [Defendant’s] vehicle immediately upon arriving in the parking lot,” Dissent at 1137, any more than the officers “specifically targeted” the first person they questioned in Delgado or Drayton. Officers checking out a large gathering (such as cars in a parking lot) have to start somewhere.
As already noted, the mere presence of multiple officers is not in' itself coercive, and in any event here the district 'court found that Defendant was hot aware of the presence of any officers other than Officer Stephens and Sergeant Anderson. See R. at 51 n.3 (“There is no basis in the evidence for finding that the other squad cars that pulled into other parts of the parking lot contributed, in any way that is significant for present purposes, to the defendant’s perception of his situation [.] ”),
Further, as we have held, there is no seizure when an officer merely approaches a person seated in a vehicle to ask what he is doing and requests a driver’s license. See United States v. Madden, 682 F.3d 920, 925 (10th Cir. 2012); see also United States v. Griffith, 533 F.3d 979, 981, 983 (8th Cir. 2008) (no seizure when one officer approached window of parked car to speak with,driver while other walked around to the back for safety); United States v. Taylor, 511 F.3d 87, 91-92 (1st Cir. 2007) (no seizure when officers parked behind car and approached driver’s window); United States v. Williams, 413 F.3d 347, 352 (3d Cir. 2005) (no seizure when officers drove up to parked van and then approached it on foot); United States v. Kim, 25 F.3d 1426, 1430 (9th Cir. 1994) (“[W]here .... officers come upon an already parked car, th[e] disparity between automobile and pedestrian stops dissipates and the driver is not clearly stopped in any sense ab initio, except of his own volition.”).
The use of a floodlight to illuminate the vehicle, as opposed to turning on emergency lights, also was not coercive. Other circuits have agreed that shining a light into a vehicle does not transform a consensual *1134 encounter into a seizure. See, e.g., United States v. Mabery, 686 F.3d 591, 597 (8th Cir. 2012) (“In this case, the act of shining a spotlight on [the defendant’s] vehicle from the street was certainly no more intrusive (and arguably less so) than knocking on the vehicle’s window.”); United States v. Washington, 490 F.3d 765, 770 (9th Cir. 2007) (no seizure when officer approached and shined flashlight into car); United States v. Douglass, 467 F.3d 621, 623-24 (7th Cir. 2006) (no seizure when officers parked in front of defendant’s car, approached car from two sides, and shined flashlights into the car); see also United States v. Clements, 522 F.3d 790, 792, 794 (7th Cir. 2008) (no seizure when “officers shined a spotlight on the [parked] Oldsmobile and activated their flashing red and blue lights [to alert the car’s occupants that they were going to approach the vehicle]” (internal quotation marks omitted) (emphasis added)). Were the officers supposed to check out the parking lot in the dark?
Finally, the approach of the officers toward the front of Defendant’s car was not coercive. To begin with, it is not clear that it was possible for the officers to approach from any other direction—Defendant had parked the car so that it was blocked on all other sides. The officers’ “resolute[]” approach, R. at 54, signaled no more than that they wished to talk with Defendant. In ordinary social intercourse, one typically approaches another person head on when initiating a conversation. Doing so does not signal that you will not give way if the other person so requests. The officers’ walking toward the front of Defendant’s vehicle is less coercive than the guarding of the factory exits by immigration agents in Delgado or the officer’s standing in the aisle while questioning bus passengers in Drayton.
I would hold that under the Supreme Court’s reasonable-person approach, there was no seizure during the officers’ initial approach to Defendant’s car. Their routine actions in pursuit of consensual conversations, taken separately or as a whole, did not convey that they were directing (coercing) Defendant into remaining where he was and engaging in conversation with them. By the time the officers drew their weapons, they had reasonable suspicion to support their action. Therefore, I concur in the affirmance of the district court.