MORITZ, Circuit Judge,
dissenting:
I agree with the lead opinion that this case turns on the timing of Roberson’s seizure. And I agree that the timing of Roberson’s seizure turns on the timing of his submission. But I disagree with the lead opinion’s conclusion that Roberson didn’t submit—and that the officers therefore didn’t seize him—until he put his hands on his steering wheel. Instead, I would hold that the officers seized Roberson within the first few seconds after the Gang Enforcement Unit, rolling four patrol cars and six officers deep, converged on Slick Willie’s parking lot.
After parking their patrol car directly in front of Roberson’s car, two of those four officers immediately “lit [his car] up with” disorienting takedown lights and spotlights, R. vol. 3, 16, and aggressively approached his car in a manner that blocked his exit path. Rather than fleeing in response to this forceful police presence, Roberson submitted to it by remaining seated in his parked car. In my view, at that point, Roberson was seized. And because, at that point, the officers admittedly had no suspicion—let alone reasonable suspicion—that Roberson was engaged in criminal activity, I would reverse and remand with directions to suppress the evidence obtained through his unlawful seizure.
*1135 I
The lead opinion is correct that the timing of Roberson’s seizure turns on the timing of his submission. Lead Op. 1123—24; see Brendlin v. California, 551 U.S. 249, 254, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007) (“A police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission....”). But I decline to shortcut the analysis by assuming, rather than deciding, that the officers exhibited a show of‘authority.
Determining the nature of the show of authority is a critical step in determining when Roberson submitted. Brendlin, 551 U.S. at 262, 127 S.Ct. 2400 (emphasizing that “what may amount to submission depends on what a person was doing before the show of authority; a fleéíng man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away”); United States v. Lowe, 791 F.3d 424, 430-31 (3d Cir. 2015) (explaining that submission question “depends on both the nature of the show of authority [and] the suspect’s conduct at the moment the officer asserted his or her authority”). And because the nature of the show of authority here effectively commanded Roberson—the stationary occupant of a parked car—to stay put, I would conclude that Brendlin rather than United States v. Salazar, 609 F.3d 1059 (10th Cir. 2010), and United States v. Mosley, 743 F.3d 1317 (10th Cir. 2014), informs the submission analysis. Guided by Brendlin, I would conclude that Roberson immediately submitted to the officers’ initial show of authority by remaining seated in his car.
A
A show of authority occurs when an officer’s words and actions would convey to a reasonable person that the officer is ordering the individual to restrict his or her movements. California v. Hodari D., 499 U.S. 621, 628, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). To determine whether a show of authority has occurred, we sometimes ask whether, viewing all of the “circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.” Id. (quoting United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (Stewart, J., concurring)). But “when a person ‘has no desire to leave’ for reasons unrelated to the police presénce,” the more relevant question is “whether ‘a reasonable person woüld feel free to decline the officers’ requests or otherwise terminate the encounter.’ ” Brendlin, 551 U.S. at 255, 127 S.Ct. 2400 (quoting Florida v. Bostick, 501 U.S. 429, 435-36, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991));
Under either of these formulations, we consider various factors—e.g., the location of the encounter, the number of officers involved, the nature of the officers’ commands, the activation of sirens or lights, and the officers’ attire and display of weapons—to measure the coercive effect of the encounter. See United States v. Hernandez, 847 F.3d 1257, 1264 (10th Cir. 2017) (listing non-exclusive factors); United States v. Little, 18 F.3d 1499, 1504 (10th Cir. 1994) (noting that courts focus on “ ‘the coercive effect of police conduct, taken as a whole,’ on a reasonable person” (quoting Michigan v. Chesternut, 486 U.S. 567, 573, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988))).
Here, the record amply demonstrates the officers’ initial actions would have conveyed to a reasonable person in Roberson’s situation that he wasn’t free to leave or otherwise terminate the encounter. The Gang Enforcement Unit—six officers in four marked Oklahoma City patrol cars— converged in a “wolf-pack” technique on Slick Willie’s parking lot. R. vol. 3, 101. *1136 Two officers parked one patrol car 15 feet from the front of Roberson’s car (the first occupied car they saw), while a second patrol car parked “[cjloser to” his car. Id. at 64. The first patrol car beamed spotlights and bright takedown lights through Roberson’s windshield, and two armed, uniformed officers got out of that patrol car and “[w]alked toward the front of [Roberson’s] . car via a route that inhibited [his], ability to leave,” R. vol. 1, 55. At that point, no reasonable person in Roberson’s situation would have believed that either getting out of the car and walking away or otherwise terminating the encounter was an option.
The. district court concluded otherwise. But in doing so, it misapplied two basic Fourth Amendment principles. The district court stated that it found “no basis in the evidence for a finding that the other squad cars that pulled into other parts of the parking lot contributed, in any way that is significant for present purposes, to the defendant’s perception of his situation.” R. vol. 1, 51 n.3. My colleagues treat this as a factual finding and accept it. See Lead Op. 1127-28 & n.15; Concurring Op. 1128-29; see also United States v. Moran, 503 F.3d 1135, 1139 (10th Cir. 2007) (“[W]e' accept the district court’s factual findings unless they are clearly erroneous.” (quoting United States v. Harris, 313 F.3d 1228, 1233 (10th Cir. 2002))).
But I view the district court’s refusal to consider the presence of the other patrol cars as a legal conclusion, and an erroneous one at that. Critically, the district court announced its factual findings at the end of the suppression hearing and, before doing so, advised both parties that they would “be stuck with [those] facts.”. R. vol. 3, 99. The court then found that “several officers arrived in separate cars,” that “there [were] a total of four cars that had a total of six officers in them,” and that the officers employed a “wolf-pack sort of technique.” R. vol. 3, 101. And the court found credible Annette Byers’ testimony that “[a]nother police car approached from the east” after the patrol car . with “bright lights appeared and pulled up near the front of [Roberson’s] , car.” Id. at 107-08. In fact, Byers testified that “possibly three police officers pulled up in different, cars,” and that after the first car with lights parked in front of Roberson’s car, a second ear parked “[c]loser to the white car”—i.e., Roberson’s car. Id. at 61, 64. Byers later reiterated that two patrol cars were “parked in front” of Roberson’s car. Id. at 71. The court also found Sergeant Stephens’ “account of the matter ,.. credible.” Id. at 109, And while Stephens testified that he didn’t remember the location of the other officers’ patrol cars, he also testified that it was “possible” Lieutenant Anderson (not.Sergeant Anderson) “would have driven his vehicle, around to ... meet” Stephens’ patrol car. Id. at 37.
By stating in its subsequent written order that.the presence of multiple patrol cars didn’t contribute “significantly” to Roberson’s perception of the situation, R. vol. 1, 51 n.3, the district court misapplied Fourth Amendment principles. First, by considering only the actions of two officers in one patrol car, the court unduly narrowed its view of the totality of the circumstances. See Chesternut, 486 U.S. at 573, 108 S.Ct. 1975 (noting that courts must “assess the coercive effect of police conduct, taken as a whole, rather than ... focus on particular details of that conduct in isolation”); Second, ,by suggesting thqt Roberson’s subjective perception of the events played a role in its analysis, the court failed to apply the proper perspective. See Hodari D., 499 U.S. at 628, 111 S.Ct. 1547 (“[T]he test for existence of a ‘show of authority’ is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer’s words.and actions *1137 would have conveyed that to a reasonable person.” (emphasis added)).[1]
The concurring opinion nonetheless follows the district court’s errant path and reaches , the same conclusion, i.e., that “,[n]othing [the two officers] did amounted to an assertion of authority.” Concurring Op. 1129. The concurring opinion recognizes the proper test for determining if a show of authority occurred is “whether a reasonable innocent person ‘would feel free to decline the officers’ requests or otherwise terminate the encounter.’ ” Id. at 1129 (quoting Brendlin, 551 U.S. at 255, 127 S.Ct. 2400). But the concurring opinion then posits that “[i]t is hardly obvious. ... how to determine whether a reasonable innocent person would feel free to leave or to decline a request” because, according to the concurring opinion, “most people will not ‘feel’ free to leave or refuse a request when confronted by a police officer.” Id.
I don’t disagree that, in many cases, the answer to the question of whether a reasonable person would feel free to terminate an encounter with one or more officers is “hardly obvious.” Id, But in this case “it is obvious that [the] officers, without uttering any words, [were] exercising their authority—ordering compliance from [Roberson].” Id. at 1130. The officers descended upon the parking lot en masse, and two officers specifically targeted the occupants of the first car they saw, parked their patrol car directly in front of that car, beamed disorienting spotlights and takedown lights toward that car, and “walk[ed] toward the front of th[at] car via a route that inhibited [Roberson’s] ability to leave.” R. vol. 1, 55.
What is not so obvious is how the concurring opinion finds the three primary cases it discusses—I.N.S. v. Delgado, 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984); Michigan v. Chesternut, 486 U.S. 567, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988); and United States v. Drayton, 536 U.S. 194, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002)—“informative” with respect to these circumstances. Concurring Op. 1131-32. Delgado and Drayton both involved multiple officers, attempting “voluntary contact,” id. at 1130, with random individuals situated among larger groups of individuals. I don’t doubt that a reasonable person might feel less intimidated when he or she is one among many workers in a large factory, see Delgado, 466 U.S. at 230, 104 S.Ct. 1758 (Brennan, J., concurring in part and dissenting in part), or one among many passengers on a public bus, see Drayton, 536 U.S. at 198, 122 S.Ct. 2105. But here, there was no large group of other individuals to dilute the coercive effect of the officers’ actions. Roberson was one among two occupants in his private vehicle. And the officers specifically targeted his vehicle immediately upon arriving in the parking lot. Neither Delgado nor Drayton speaks to these circumstances.
The third, case, Chesternut, did involve officers targeting a specific individual. 486 U.S. at 569, 108 S.Ct. 1975. But the similarities between Chesternut and this case *1138 begin and end there. In Chesternut, the defendant saw a police car approaching the intersection where he was standing and ran the other way. Id. The officers caught up with him and drove their patrol ear alongside him as he continued running. Id. As the concurring opinion points out, the Court found nothing in the record in that case to show that the officers used sirens or flashing lights, commanded the defendant to halt, or “operated the car in an aggressive manner to block [the defendant’s] course or otherwise control the direction or speed of his movement.” Concurring Op. 1131 (alteration in original) (quoting Chesternut, 486 U.S. at 575, 108 S.Ct. 1975). Here though, Roberson was seated in his parked car when six police officers in four patrol cars converged on the parking lot; one patrol car parked directly in front of Roberson’s ear and trained its bright takedown lights and spotlights on his car; and two officers approached his parked car in a manner that inhibited his ability to drive away. To be fair, the officers here, like the officers in Chestemut, didn’t explicitly command Roberson to halt. But it would make little sense for them to do so given that Roberson was seated in his parked car. Thus, like Delgado and Drayton, Chesternut bears little resemblance to this case.
Finally, the concurring opinion adopts a piecemeal approach to evaluating whether the officers exhibited a show of authority: it reasons that neither the presence of multiple officers, nor their action in “merely approaching]” Roberson’s car to talk to him, Concurring Op. at 1133, nor their “use of a floodlight to illuminate the vehicle,” id. at 1133, nor their manner of approaching the front of Roberson’s blocked-in vehicle was coercive.
It’s true, but unremarkable, that “there is no seizure when an officer merely approaches a person seated in a vehicle to ask what he is doing and requests a driver’s license.” Id. at 1133. And I don’t dispute that other circuits have concluded “that shining a light into a vehicle does not transform a consensual encounter into a seizure.” Id. at 1133-34. But the show-of-authority analysis requires us .to consider “the coercive effect of police conduct, taken as a whole”—not in bits and pieces. Chesternut, 486 U.S. at 573, 108 S.Ct. 1975. Thus, rather than sift through cases that each address only one or two of the circumstances that exist here,[2] I consider collectively all of the circumstances pres *1139 ent. And doing so leads me to disagree with the concurring opinion’s conclusion that the officers’ conduct in this case, taken as a whole, “signaled no more than that they wished to talk with [Roberson],” or equates to “ordinary social intercourse.” Concurring Op. 1134. Instead, the officers’ conduct was a show of authority.
The only remaining question, therefore, is when Roberson submitted to that show of authority. And the answer to that question turns on how he submitted.
B
The lead opinion cites Brendlin for the proposition that “[a] show of authority alone is not a seizure ‘without actual submission.’ ” Lead. Op. 1121 (quoting Brendlin, 551 U.S. at 254, 127 S.Ct. 2400). I agree. But, after a brief nod to Brendlin, the lead opinion builds its submission analysis around Salazar and Mosley. In doing so, the lead opinion (1) disregards Brend-lin’s guidance that an individual can submit to a show of authority through passive acquiescence and (2) overlooks a critical distinction between the-show of force here and the show of force in Mosley.
In Brendlin, the question before the Court was “whether a traffic'stop subjects a passenger ... to [a] Fourth Amendment seizure.” Id. at 254, 127 S.Ct. 2400. The Brendlin Court answered that question in the affirmative, holding that a traffic stop seizes a passenger of a stopped car just as it seizes a driver. Id. at 251, 127 S.Ct. 2400. In reaching that conclusion, the Court rejected the notion that a passenger can’t be seized by a traffic stop simply because he or she has no ability to signal submission to the officer’s command to stop the car. Id. at 261-62, 127 S.Ct. 2400. Specifically, the Court acknowledged that while the vehicle in which the defendant was a passenger was moving, the defendant “had no effective way to signal submission.” Id. at 262, 127 S.Ct. 2400. But the Court concluded that once the car “came to a stop,” the defendant “could, and apparently did, submit by staying inside.” Id. •
Critically, the Court emphasized that “what may amount to submission depends on what a person was doing before the show of authority; a fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away.” Id. And the Court explained that “when an individual’s submission to a show of governmental authority takes the form of passive acquiescence,” the “test for telling when a seizure occurs” is the Mendenhall/Bostick test. Brendlin, 551 U.S. at 255, 127 S.Ct. 2400.
Applying that test, the Court determined that the officers seized the defendant when they effected the traffic stop because (1) “any reasonable passenger would have understood the police officers to be exercising control to the point that no one in the car was free to depart without police permission,” id. at 257, 127 S.Ct. 2400, and (2) the defendant submitted through passive acquiescence by remaining inside the car during-the traffic stop, id. at 262, 127 S.Ct. 2400.
Here, as discussed, the officers’ initial show of authority implicitly commanded Roberson—the stationary occupant of a parked car—to stay put. Thus, Brendlin informs the submission analysis. See, e.g., United States v. Stover, 808 F.3d 991, 1001-02 (4th Cir. 2015) (Gregory, J., dissenting) (reasoning that Brendlin’s “passive acquiescence test” applied to determine when officers seized occupant of parked car); United States v. Jones, 562 F.3d 768, 774 & n.3 (6th Cir. 2009) (applying Brendlin to determine if occupants of car that was “hemmed in” by two police vehicles submitted to show of authority).
And applying Brendlin, I would conclude that Roberson immediately submit *1140 ted to the officers’ command through passive acquiescence by remaining seated in his parked car in response to the command to stay put, rather than attempting to flee on foot or run over the approaching officers by driving away. Compare Lowe, 791 F.3d at 433 .(citing. Brendlin for proposition that “responding to a show of authority by staying put is a means of passively submitting to that authority”), with Jones, 562 F.3d at 774 (applying Brendlin and concluding that defendant didn’t submit because he “did not passively acquiesce; he did not remain seated in the Nissan.... Rather, he opened the car door and ‘jumped out’ as though he wanted to run”).
But the lead opinion disregards Brend-lin’s guidance on submission through passive. acquiescence. Rather than applying the Mendenhall/Bostick test, the lead opinion applies a slightly different one. It states, “Actual submission depends on ‘the view of a reasonable law enforcement officer’ under ‘the totality of .the circumstances.’ ” Lead Op. 1122 (quoting Salazar, 609 F.3d at 1064-65); see also id. at 1125 (“[WJhether and when an individual submits to a show of authority turns on the perception of a reasonable officer, not that of the individual.”). But the Menden-hall/Bostick test says nothing about analyzing submission , from a. reasonable officer’s view. See Brendlin, 551 U.S. at 255, 127 S.Ct. 2400 (explaining the relevant test for determining whether the defendant submitted through passive acquiescence is “whether ‘a reasonable person would feel free to decline the officers’ requests or otherwise terminate the encounter’ ” (quoting Bostick, 501 U.S. at 436, 111 S.Ct. 2382)).
I agree that this court adopted a “reasonable officer” test in Salazar. See 609 F.3d at 1065 (“[W]e consider whether a citizen has submitted to authority by examining the view of a reasonable law enforcement officer under the circumstances.” (citing United States v. Cardoza, 129 F.3d 6, 14 n.4 (1st Cir. 1997))). And I recognize that we are bound by Salazar. But I nevertheless question its basis for adopting such a test. Significantly, Salazar cited Cardoza for support. See id. But Cardoza said only, “[Gjiven the generally objective standards employed in Fourth Amendment seizure analysis, we would see little reason to inquire into the subjective intent of the detainee in making the determination whether or not he or she has ‘submitted to’ a show of authority.” Cardoza, 129 F.3d at 14 n.4.
It simply doesn’t follow from the fact that we don’t inquire into the detainee’s subjective intent that we must therefore necessarily inquire into a reasonable officer’s view of the circumstances. Moreover, we appear to be the only circuit that has explicitly adopted this “reasonable officer” test. See Stover, 808 F.3d at 1006-07 (Gregory, J., dissenting) (criticizing Salazar as “troubling precedent,” noting that “the Tenth Circuit has offered no analytical basis for its ‘reasonable officer’ rule,” and pointing out that no other circuit has explicitly adopted it).
In addition to adding the Salazar gloss to the Mendenhall/Bostick test, the lead opinion opts to follow Mosley while overlooking a critical distinction between the show of force there and the one in this case. In Mosley, two officers responding to an anonymous tip approached a parked car in a Denny’s parking lot. 743 F.3d at 1321. The officers took the occupants of, the car by surprise, and, with weapons drawn, immediately commanded the occupants to show their hands. Id. One occupant complied, But the defendant did not—at least, not immediately. Instead, he “hesitated briefly,” “began making furtive motions,” and ignored the officers’ repeated commands before eventually complying. Id.
In determining when the defendant was seized in Mosley, we reasoned that “the *1141 officers clearly showed their authority by raising their weapons and shouting ‘hands up,’ but [defendant—although he may have frozen momentarily out of confusion—did not immediately manifest compliance with their orders.” Id. at 1327. And we suggested that had the defendant “simply sat still in response to the officer’s commands and allowed himself to be seized from the outset, the seizure may not have been valid.” Id. But we held that the defendant, by making furtive motions and therefore acting “directly contrary to the officers’ commands,” “did not manifest submission.” Id. Thus, we concluded that the officers didn’t seize the defendant until he “manifested compliance with the officers’ orders—when he put his hands up.” Id.
The lead opinion applies Mosley’s, reasoning to conclude that Roberson didn’t submit, hnd therefore wasn’t seized, until he complied with the officers’ commands to show his hands by placing his hands on the steering wheel. Lead Op. 1126. But in doing so, the lead opinion overlooks a critical distinction between the show of force here and the show of force in Mosley. Here, the officers didn’t sneak up on Roberson and catch him by surprise, as did the officers in Mosley. Nor did they immediately order him to show his hands. Instead, after the officers here forcefully made their presence known, Roberson had at least a few seconds to process that several patrol cars had entered the parking lot, one patrol car had pinpointed him by shining bright lights on his car, and two officers were aggressively, approaching his car. Because this show of authority was an implicit, command, for Roberson to stay put—not an immediate and explicit command for Roberson to show his hands[3]—and because Roberson complied with that order, Mosley’s submission analysis simply doesn’t apply here. See Mosley, 743 F.3d at 1326 (emphasizing that in order to submit to show of authority, individual must comply with police orders).
Finally, relying on Mosley, the lead opinion makes much of Roberson’s stuffing motions. But I see no . reason to consider them. Unlike the defendant in Mosley, who made stuffing motions in direct defiance of an explicit command to put his hands up, Roberson made, those motions only after he submitted to the officers’ initial command to stay put and, critically, before the officers ever commanded him to raise his hands.[4] In short, the officers’ initial show of authority ordered Roberson to stay put. And he did. Their command and Rober *1142 son’s immediate compliance with it constituted a seizure. Thus, I wouldn’t consider anything that happened after that point— including Roberson’s post-seizure stuffing motions—as evidence of non-submission.[5]
⅜ * #
While Sergeant Stephens may have subjectively “hoped and intended” to initiate voluntary contact with Roberson, R. vol. 1, 54, the officers’ collective actions objectively demonstrate that there was nothing voluntary about Roberson’s New Year’s Eve encounter with the police. Instead, as Roberson and his date sat in Roberson’s car in the parking lot of Slick Willie’s pool hall, four patrol cars carrying six officers converged all at once in a pack and two officers immediately zeroed in on Roberson’s car, admittedly with absolutely no suspicion or basis for doing so. They purposely blinded Roberson with their take-down lights. And with them aggressive approach on foot, they effectively blocked his vehicle from leaving the parking lot. I would conclude that, with these blatant and purposeful actions, the officers unlawfully seized Roberson by asserting a show of authority to which he immediately submitted by remaining seated in his car. Further, I would find that Roberson’s post-seizure stuffing motions did not belatedly transform that unlawful seizure into a lawful one. Thus, I would reverse and remand with directions to suppress the evidence derived from the illegal seizure.

. Even if I could join my colleagues in treating the district court’s legal conclusion as a factual finding, I would reject it as clearly erroneous. As discussed, the district court expressly found that multiple patrol cars con- .. verged on the parking lot. And Byers’ testimony supports that.she was aware of their presence. But the district court didn’t find, and there is no evidence to support, that Roberson—who was seated next to Byers in his car—was unaware of the other patrol cars. See Hernandez, 847 F.3d at 1263 (10th Cir. 2017) ("A finding of fact is clearly erroneous if it is without factual support in the record or if, after reviewing all of the evidence, we ,are left with the definite and firm conviction that a mistake has been made,” (quoting In re Vaughn, 765 F.3d 1174, 1180 (10th Cir. 2014))). Rather, the court simply asserted that the presence of the other patrol cars didn’t “contribute[ ] ... to [Roberson's] perception of his situation.” R. vol. 1, 51 n.3.

. For example, the concurring opinion cites United States v. Mabery, 686 F.3d 591 (8th Cir. 2012), and United States v. Douglass, 467 F.3d 621 (7th Cir. 2006) for the proposition that shining a spotlight on a parked car doesn't constitute a seizure. Concurring Op. 1133-34. True enough. But in Mabery, one patrol car stopped near a parking lot entrance and shined a spotlight on the defendant’s car from the street. Beyond that, the two officers in the patrol car "did nothing else that would support a demonstration of authority." 686 F.3d at 597. Moreover, even if the court had found a show of authority in Mabery, the defendant didn't submit to it; he "dropped his contraband and fled the police.” Id. That isn’t what' happened here. Douglass is likewise dissimilar. There, two patrol officers responded to a possible assault in a parking lot. Armed with an address, a specific description of the vehicle believed to be involved, and the license plate number of that vehicle, the officers found the suspect vehicle, parked their patrol car directly in front of it and—with one officer on each side—-approached the car. 467 F.3d at 622. One officer asked the man seated in the driver's seat for identification. Id. At the same time, the second officer shined a flashlight into the car, saw ammunition, and shouted " '10-32,' the police code for a gun.” Id. The first officer drew his gun and ordered the man out of the car, but the man “seemed to be looking aroundf] possibly for an escape route,” and refused to get out of the car. Id. Like the officers, the man then found what he was looking for: he put his car in gear, drove around the patrol car, and fled the parking lot. Id. at 622-23. Each of these cases shares some similarities with this one, but not enough to offer any meaningful guidance.

. The lead opinion characterizes this distinction as immaterial; Lead Op. 1128. But this distinction is key. As I’ve stated, the officers in Mosley approached the car in which the defendant was a passenger, drew their guns, and explicitly ordered the defendant to raise his hands. 743 F.3d at 1321, 1327. Here, the officers approached Roberson’s car with a show of authority that effectively, albeit implicitly, ordered Roberson to remain in place. But they didn't immediately order him, to raise his hands. Thus, Roberson complied with the officers’ initial implied order to remain in place, whereas the defendant in Mosley directly disobeyed the officers’ initial order to raise his hands. Mosley, 743 F.3d at 1327.

. Notably, even the defendant in Brendlin didn’t remain frozen in place after he submitted to the show of authority by remaining seated inside the stopped vehicle in which he was a passenger. Instead, he "briefly open[ed] and then close[d] the passenger door” in full view of the officer conducting the traffic stop. 551 U.S. at 252, 127 S.Ct. 2400. Yet in concluding that the defendant in Brendlin submitted by remaining inside the stopped car, id. at 262, 127 S.Ct. 2400, the Court summarily dismissed the state court’s suggestion that the defendant’s movements signaled he was "awar[e] of the available options,” i.e., the options to not submit, either by leaving or otherwise ignoring the officers’ commands. Id. at 258 n.4, 127 S.Ct. 2400 (alteration in original) (quoting People v. Brendlin, 38 *1142 Cal.4th 1107, 45 Cal.Rptr.3d 50, 136 P.3d 845, 852 (2006)). Instead, the Court reasoned that the defendant’s "conduct could equally be taken to indicate that [he] felt compelled to remain inside the car.” Id. at 258 n.4, 127 S.Ct. 2400. The Court didn't even hint that the defendant’s post-seizure movements somehow negated the defendant’s initial submission. Id. at 261-63, 127 S.Ct. 2400.

. I don’t discount that, for safety reasons, the officers were justified in ordering Roberson to raise his hands after he began making stuffing motions. But the officers simply can’t rely on Roberson’s post-seizure stuffing motions, his non-compliance with post-seizure commands, or their ultimate discovery of incriminating evidence to justify the unlawful seizure.